Mark T. Flewelling (Bar No. 96465)
    mflewelling@lagerlof.com
Michael Rapkine (Bar No. 222811)
    mrapkine@lagerlof.com
LAGERLOF, LLP
155 North Lake Avenue, 11th Floor
Pasadena, California 91101
Telephone: (626) 793-9400
Facsimile: (626) 793-5900

Attorneys for Plaintiff
WELLS FARGO BANK, N.A.
a national banking association
("Wells Fargo")

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WELLS FARGO BANK, N.A., a national banking association,<br><br>            Plaintiff,<br><br>      v.<br><br>STEWART HOMES, INC., a California corporation, dba 5 Star Homes; CAPITAL (360), INC., a California corporation; DAVID M. TOFOLO, an individual; AMY S. STEWART, trustee of the STEWART TRUST; and DOES 1-10, inclusive,<br><br>            Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>1.  Breach of Written Contract<br>2.  Right to Refund Under Cal. Commercial Code Section 4-214<br>3.  Money Had and Received<br>4.  Money Paid<br>5.  Money Had and Received<br>6.  Money Paid<br>7.  Conversion<br>8.  Violation of Cal. Penal Code Section 496 (Theft)<br>9.  Unfair Business Practices<br>10. Declaratory Relief |

Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") alleges:

1.      This action arises from a check kiting scheme initiated by the Chief Executive Officer of Stewart Homes Inc., Michael Stewart, who is deceased.  Wells Fargo, which sustained a loss of not less than $1,407,126.03 as a result of the scheme, seeks to recover its loss, treble damages, as well as declaratory and other equitable relief.

## **PARTIES**

2.      Plaintiff Wells Fargo is, and at all times mentioned in this complaint was, a national banking association with its main office located in Sioux Falls, South Dakota.  It is authorized to do business, and does business, in California. Wells Fargo is a citizen of South Dakota for diversity purposes.

3.      Defendant Stewart Homes, Inc., dba 5 Star Homes ("Stewart Homes"), is a California corporation that, on information and belief, is headquartered in Stanton, California and authorized to do business in California. It is a citizen of California for diversity purposes.

4.      Defendant Capital (360), Inc. ("Capital") is a California corporation that, on information and belief, is headquartered in Dana Point, California, and is authorized to do business in California.  It is a citizen of California for diversity purposes.

5.      Defendant David M. Tofolo ("Tofolo") is an individual who, on information and belief, is an investor in Stewart Homes and resides in Laguna Niguel, California, with the intention of remaining there indefinitely.

6.      Defendant Amy S. Stewart ("Stewart") is, on information and belief, the successor trustee of the Stewart Family Trust, which is the sole shareholder of Stewart Homes.  On further information and belief, Amy Stewart resides in San Juan Capistrano, California, with the intention of remaining there indefinitely.

7.      If new facts come to the attention of Wells Fargo, it will amend this Complaint accordingly.

8.     On information and belief, Wells Fargo alleges that each of the Defendants was an agent, partner, employee, or joint venturer of other defendants and acting within the course and scope of such agency, employment, joint venture, or partnership.

9.     On information and belief, Wells Fargo alleges that defendant Stewart Homes failed to observe corporate formalities pursuant to California law, including without limitation commingling corporate assets with the assets of Michael Stewart and the Stewart Family Trust.  There is a unity of interest and ownership such that the interests of Stewart Homes and the Stewart Family Trust are not separate and distinct. Defendant Stewart Homes is therefore the alter ego of the Stewart Family Trust, and they are both liable, jointly and severally, for the claims alleged below.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332. The citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as one or more defendants reside in Orange County and most, if not all, of the events giving rise to this action arose in the Central District of California.

**GENERAL ALLEGATIONS**

12.     On October 29, 2018, defendant Capital opened a Wells Fargo business checking account ending in #.... 5167 (the "Capital Account"). To open the Capital Account, Capital's Chief Executive Officer Frank Arlasky executed an account application.  A true and correct copy of the application (the "Capital Application") is attached to the Complaint as <u>Exhibit 1</u>. As with each exhibit to the Complaint, certain portions of Exhibit 1 have been partially redacted to protect the privacy rights of the defendants.

13.     In the Capital Application, defendant Capital acknowledged receipt of, and agreed to be bound by, the terms and conditions of the applicable deposit account

1  agreement when the account was opened, and by all modifications to that agreement.

2  14.  The Capital Account is governed by a Deposit Account Agreement

3  effective November 15, 2022. A true and correct copy of the Deposit Account

4  Agreement is attached to the Complaint as <u>Exhibit 2</u>.

5  15.  The Deposit Account Agreement memorializes Wells Fargo's right to

6  charge the Capital Account for unpaid items as well as Capital's obligation to repay

7  Wells Fargo for overdrafts and for any account activity that results in a negative

8  balance in the Capital Account.

9  16.  In October 2021, there was an internal conversion by Wells Fargo of

10  the account number for the Capital Account.  The number for the Capital Account

11  changed to an account ending in #...5813.

12  17.  From July 7, 2023 through July 11, 2023, defendant Stewart Homes

13  drew the following checks on its deposit account at Enterprise Bank & Trust, each

14  made payable to defendant Capital (the "Stewart Checks):

| CHECKS FROM STEWART HOMES INC TO CAPITAL (360), INC. | | | | | |
|---|---|---|---|---|---|
| Drawn on Enterprise Bank & Trust, Account No. ending in 5360. | | | | | |
| DRAWN BY | CHECK NUMBER | CHECK DATE | DEPOSIT DATE | AMOUNT | RETURNED |
| Stewart Homes, Inc., 5 Star Homes | 32795 | 7/7/2023 | 7/11/2023 | $76,000 | YES (RFM) |
| Stewart Homes, Inc., 5 Star Homes | 32796 | 7/7/2023 | 7/11/2023 | $77,000 | YES (RFM) |
| Stewart Homes, Inc., 5 Star Homes | 32805 | 7/7/2023 | 7/11/2023 | $75,000 | YES (RFM) |
| Stewart Homes, Inc., 5 Star Homes | 32806 | 7/7/2023 | 7/11/2023 | $78,000 | YES (RFM) |
| Stewart Homes, Inc., 5 Star Homes | 32807 | 7/7/2023 | 7/11/2023 | $81,000 | YES (RFM) |
| Stewart Homes, Inc., 5 Star Homes | 32808 | 7/7/2023 | 7/11/2023 | $85,000 | YES (RFM) |
| Stewart Homes, Inc., 5 Star Homes | 32809 | 7/7/2023 | 7/11/2023 | $79,000 | YES (RFM) |
| Stewart Homes, Inc., 5 Star Homes | 32811 | 7/7/2023 | 7/11/2023 | $79,000 | YES (RFM) |

| | | | | | |
|---|---|---|---|---|---|
| 1 | Stewart Homes, Inc., 5 Star Homes | 32812 | 7/7/2023 | 7/11/2023 | $81,000 | YES (RFM) |
| 2 | Stewart Homes, Inc., 5 Star Homes | 32821 | 7/7/2023 | 7/11/2023 | $82,000 | YES (RFM) |
| 3 | Stewart Homes, Inc., 5 Star Homes | 32804 | 7/7/2023 | 7/12/2023 | $70,000 | YES (RFM) |
| 4 | Stewart Homes, Inc., 5 Star Homes | 32813 | 7/7/2023 | 7/12/2023 | $85,000 | YES (RFM) |
| 5 | Stewart Homes, Inc., 5 Star Homes | 32814 | 7/7/2023 | 7/12/2023 | $84,000 | YES (RFM) |
| 6 | Stewart Homes, Inc., 5 Star Homes | 32815 | 7/7/2023 | 7/12/2023 | $75,000 | YES (RFM) |
| 7 | Stewart Homes, Inc., 5 Star Homes | 32816 | 7/7/2023 | 7/12/2023 | $77,000 | YES (RFM) |
| 8 | Stewart Homes, Inc., 5 Star Homes | 32817 | 7/7/2023 | 7/12/2023 | $71,000 | YES (RFM) |
| 9 | Stewart Homes, Inc., 5 Star Homes | 32818 | 7/7/2023 | 7/12/2023 | $76,000 | YES (RFM) |
| 10 | Stewart Homes, Inc., 5 Star Homes | 32820 | 7/7/2023 | 7/12/2023 | $85,000 | YES (RFM) |
| 11 | Stewart Homes, Inc., 5 Star Homes | 32822 | 7/7/2023 | 7/12/2023 | $83,000 | YES (RFM) |
| 12 | Stewart Homes, Inc., 5 Star Homes | 32823 | 7/7/2023 | 7/12/2023 | $81,000 | YES (RFM) |
| 13 | Stewart Homes, Inc., 5 Star Homes | 32824 | 7/7/2023 | 7/12/2023 | $72,000 | YES (RFM) |
| 14 | Stewart Homes, Inc., 5 Star Homes | 33047 | 7/10/2023 | 7/12/2023 | $82,000 | YES (RFM) |
| 15 | Stewart Homes, Inc., 5 Star Homes | 33048 | 7/10/2023 | 7/12/2023 | $79,000 | YES (RFM) |
| 16 | Stewart Homes, Inc., 5 Star Homes | 33192 | 7/11/2023 | 7/13/2023 | $18,000 | YES (NSF) |
| 17 | Stewart Homes, Inc., 5 Star Homes | 32975 | 7/10/2023 | 7/17/2023 | $79,000 | YES (NSF) |
| 18 | Stewart Homes, Inc., 5 Star Homes | 32976 | 7/10/2023 | 7/17/2023 | $80,000 | YES (NSF) |
| 19 | Stewart Homes, Inc., 5 Star Homes | 32977 | 7/10/2023 | 7/17/2023 | $81,000 | YES (NSF) |
| 20 | Stewart Homes, Inc., 5 Star Homes | 32978 | 7/10/2023 | 7/17/2023 | $88,000 | YES (NSF) |
| 21 | Stewart Homes, Inc., 5 Star Homes | 32979 | 7/10/2023 | 7/17/2023 | $87,000 | YES (NSF) |
| 22 | Stewart Homes, Inc., 5 Star Homes | 33177 | 7/10/2023 | 7/17/2023 | $68,000 | YES (RFM) |
| 23 | Stewart Homes, Inc., 5 Star Homes | 33178 | 7/10/2023 | 7/17/2023 | $80,000 | YES (RFM) |
| 24 | Stewart Homes, Inc., 5 Star Homes | 33179 | 7/10/2023 | 7/17/2023 | $81,000 | YES (RFM) |

| Stewart Homes, Inc., 5 Star Homes | 33180 | 7/10/2023 | 7/17/2023 | $79,000 | YES (RFM) |
|---|---|---|---|---|---|
| Stewart Homes, Inc., 5 Star Homes | 33181 | 7/10/2023 | 7/17/2023 | $79,000 | YES (RFM) |
| **TOTAL** | | | | **$2,633,000** | |

18.  From July 11, 2023, through July 17, 2023, defendant Capital deposited the Stewart Checks into the Capital Account.

19.  Pursuant to the Deposit Account Agreement and Federal regulations, Wells Fargo provisionally credited to the Capital Account amounts equal to the Stewart Checks.

20.  Immediately after receipt of the Stewart Checks, defendant Capital drew the following checks back to Stewart Homes using the funds that Wells Fargo had provisionally credited to the Capital Account.

| CHECKS FROM CAPITAL (360) PAID TO STEWART HOMES, INC. | | | | |
|---|---|---|---|---|
| Drawn on Wells Fargo Account No. ending in 5813. | | | | |
| DRAWN BY | CHECK NUMBER | CHECK DATE | DEPOSIT DATE | AMOUNT |
| Capital (360), Inc. | 3101 | 7/10/2023 | 7/11/2023 | $81,000 |
| Capital (360), Inc. | 3102 | 7/10/2023 | 7/11/2023 | $80,000 |
| Capital (360), Inc. | 3109 | 7/10/2023 | 7/11/2023 | $69,000 |
| Capital (360), Inc. | 3114 | 7/10/2023 | 7/11/2023 | $79,000 |
| Capital (360), Inc. | 3117 | 7/10/2023 | 7/11/2023 | $83,000 |
| Capital (360), Inc | 3118 | 7/10/2023 | 7/11/2023 | $79,000 |
| Capital (360), Inc. | 3103 | 7/10/2023 | 7/12/2023 | $83,000 |
| Capital (360), Inc. | 3104 | 7/10/2023 | 7/12/2023 | $79,000 |
| Capital (360), Inc. | 3105 | 7/10/2023 | 7/12/2023 | $74,000 |
| Capital (360), Inc. | 3106 | 7/10/2023 | 7/12/2023 | $69,000 |
| Capital (360), Inc. | 3107 | 7/10/2023 | 7/12/2023 | $75,000 |
| Capital (360), Inc. | 3108 | 7/10/2023 | 7/12/2023 | $73,000 |
| Capital (360), Inc. | 3110 | 7/10/2023 | 7/12/2023 | $70,000 |
| Capital (360), Inc. | 3112 | 7/10/2023 | 7/12/2023 | $82,000 |
| Capital (360), Inc. | 3113 | 7/10/2023 | 7/12/2023 | $83,000 |
| Capital (360), Inc. | 3121 | 7/10/2023 | 7/12/2023 | $68,000 |
| Capital (360), Inc. | 3248 | 7/12/2023 | 7/12/2023 | $80,000 |
| Capital (360), Inc. | 3249 | 7/12/2023 | 7/12/2023 | $77,000 |
| Capital (360), Inc. | 3250 | 7/12/2023 | 7/12/2023 | $78,000 |
| **TOTAL** | | | | **$1,462,000** |

21.     Stewart Homes then drew the following checks from its Enterprise Bank & Trust account to defendant David Tofolo, which were deposited on July 11, 2023, into Tofolo's deposit account at Wells Fargo.

| CHECKS FROM STEWART HOMES PAID TO DAVID TOFOLO | | | | |
|---|---|---|---|---|
| Drawn on Enterprise Bank & Trust Account No. ending in 5360. | | | | |
| DRAWN BY | CHECK NUMBER | CHECK DATE | DEPOSIT DATE | AMOUNT |
| Stewart Homes, Inc., 5 Star Homes | 32463 | 7/9/2023 | 7/11/2023 | $69,000 |
| Stewart Homes, Inc., 5 Star Homes | 32464 | 7/9/2023 | 7/11/2023 | $68,000 |
| Stewart Homes, Inc., 5 Star Homes | 32465 | 7/9/2023 | 7/11/2023 | $65,000 |
| Stewart Homes, Inc., 5 Star Homes | 32549 | 7/9/2023 | 7/11/2023 | $65,000 |
| Stewart Homes, Inc., 5 Star Homes | 32836 | 7/9/2023 | 7/11/2023 | $71,000 |
| Stewart Homes, Inc., 5 Star Homes | 32837 | 7/9/2023 | 7/11/2023 | $69,000 |
| Stewart Homes, Inc., 5 Star Homes | 32953 | 7/9/2023 | 7/11/2023 | $64,000 |
| Stewart Homes, Inc., 5 Star Homes | 32954 | 7/9/2023 | 7/11/2023 | $62,000 |
| Stewart Homes, Inc., 5 Star Homes | 32984 | 7/9/2023 | 7/11/2023 | $90,000 |
| Stewart Homes, Inc., 5 Star Homes | 33027 | 7/10/2023 | 7/11/2023 | $69,000 |
| Stewart Homes, Inc., 5 Star Homes | 33028 | 7/10/2023 | 7/11/2023 | $67,000 |
| Stewart Homes, Inc., 5 Star Homes | 33029 | 7/10/2023 | 7/11/2023 | $65,000 |
| Stewart Homes, Inc., 5 Star Homes | 33030 | 7/10/2023 | 7/11/2023 | $65,000 |
| Stewart Homes, Inc., 5 Star Homes | 33031 | 7/10/2023 | 7/11/2023 | $67,000 |
| Stewart Homes, Inc., 5 Star Homes | 33036 | 7/10/2023 | 7/11/2023 | $73,000 |
| Stewart Homes, Inc., 5 Star Homes | 33037 | 7/10/2023 | 7/11/2023 | $72,000 |
| TOTAL | | | | $1,101,000 |

22.     From July 20 through July 26, 2023, the Stewart Checks were returned unpaid, and the provisional credits applied to the Capital Account were reversed. The reversal of the provisional credits resulted in a $1,407,126.03 negative balance in the Capital Account as of July 31, 2023.  Attached to the Complaint as <u>Exhibit 3</u> is a true and correct copy of the monthly account statement for the Capital Account from July 2023, which reflects this negative balance.

23.     Despite Wells Fargo's demand, defendant Capital has failed and refused to repay the overdraft or otherwise restore the Capital Account to a positive balance.  The negative balance within the Capital Account presently stands at $1,407,126.03.

24.     The check kiting scheme initiated by Stewart Homes and its CEO Michael Stewart is illustrated in the diagram on the next page.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /



7/7/23-7/10/23: Stewart Homes writes 33 NSF checks totaling $2,633,000 to Capital (360) Inc. ("Stewart Checks")

7/20/23-7/26/23: Provisional credits are reversed creating a $1,407,126.03 negative balance in the Capital Account

7/11/23-7/17/23: Capital (360) deposits Stewart Checks into Wells Fargo account

7/11/23: David Tofolo deposits 16 checks from Stewart Homes totaling $1,101,000

7/12/23: Wells Fargo provisionally credits funds to Capital Account

7/20/23-7/26/23: Stewart Homes Checks returned unpaid

7/10/23-7/12/23: Capital (360) writes 17 checks to Stewart Homes. Checks are written against provisionally credited funds ("Cap 360 Checks")

7/11/23-7/12/23: Stewart Homes deposits Cap 360 Checks

## FIRST CLAIM FOR RELIEF – BREACH OF WRITTEN CONTRACT

### (Against Defendant Capital)

25.     Plaintiff realleges and incorporates by reference paragraphs 1 through 24 as though set forth in full herein.

26.     The Deposit Account Agreement (Exhibit 2) memorializes Wells Fargo's right to charge the Capital Account for unpaid items as well as Capital's obligation to repay Wells Fargo for overdrafts and for any account activity that results in a negative balance in the Capital Account.

27.     From July 11, 2023, through July 17, 2023, defendant Capital deposited the Stewart Checks into the Capital Account.

28.     Pursuant to the Deposit Account Agreement and Federal regulations, Wells Fargo provisionally credited the Capital Account with amounts equal to the Stewart Checks.

29.     Between July 11, 2023, and July 12, 2023, defendant Capital paid Stewart Homes at least $1,462,000 from the provisionally credited funds.

30.     Between July 20, 2023, and July 26, 2023, the Stewart Checks were returned unpaid, and the provisional credits reversed.  The reversal of the provisional credits resulted in a $1,407,126.03 negative balance in the Capital Account on July 31, 2023.

31.     Despite Wells Fargo's demand, defendant Capital failed and refused to repay the overdrafts or otherwise restore the Capital Account to a positive balance. Presently, the Capital Account has a negative balance of $1,407,126.03.

32.     Wells Fargo performed each term and condition the Deposit Account Agreement required of it, except for those terms and conditions excused by defendant Capital's breach.

33.     Defendant Capital's failure to repay the overdrafts or restore the Capital Account to a positive balance breached the Deposit Account Agreement.

34.     Defendant Capital's breach caused Wells Fargo to sustain damages of

1    not less than $1,407,126.03, plus interest at the highest rate allowed by law.

2    35.    The Deposit Account Agreement entitles Wells Fargo to recover its

3    attorneys' fees and costs to prosecute this action. Wells Fargo therefore seeks the

4    attorneys' fees and costs it incurs in this action.

5    **SECOND CLAIM FOR RELIEF – RIGHT TO REFUND UNDER**

6    **CALIFORNIA COMMERICIAL CODE § 4-214**

7    **(Against Defendant Capital)**

8    36.    Wells Fargo realleges and incorporates by reference paragraphs 1

9    through 35 as though set forth in full herein.

10   37.    Pursuant to California Commercial Code § 4-214, if "a collecting bank

11   has made provisional settlement with its customer for an item and fails by reason of

12   dishonor . . . the bank may revoke the settlement given by it, charge back the amount

13   of any credit given for the item to its customer's account, or obtain refund from its

14   customer . . ."

15   38.    Accordingly, Wells Fargo had the right under the Commercial Code to

16   reverse the provisional credits for the Stewart Checks and it is entitled to obtain a

17   refund from defendant Capital for the negative balance in the Capital Account.

18   39.    Wells Fargo is entitled to recover from defendant Capital damages of

19   at least $1,407,126.03, plus expenses and interest at the highest rate permitted by

20   law.

21   **THIRD CLAIM FOR RELIEF – MONEY HAD AND RECEIVED**

22   **(Against Defendant Capital)**

23   40.    Wells Fargo realleges and incorporates by reference paragraphs 1

24   through 39 as though set forth fully herein.

25   41.    Wells Fargo provisionally credited the Capital Account with the

26   amount equal to the Stewart Checks.

27   42.    Defendant Capital immediately drew on the provisionally credited

28   funds, diverting at least $1,462,000.00 back to Stewart Homes.

43.     Shortly thereafter, the Stewart Checks were returned unpaid because each check was backed by insufficient funds.  Accordingly, Wells Fargo reversed the provisional credits in the Capital Account, resulting in a negative balance of $1,407,126.03 within the Capital Account.

44.     Despite Wells Fargo's demand that Capital restore the Capital Account to a positive balance, defendant Capital has failed to repay Wells Fargo for its loss.

45.     There is now due, owing, and unpaid to Wells Fargo the sum of not less than $1,407,126.03 plus interest at the highest rate permitted by law.

## FOURTH CLAIM FOR RELIEF—MONEY PAID

### (Against Defendant Capital)

46.     Wells Fargo realleges and incorporates by reference paragraphs 1 through 45 as though set forth fully herein.

47.     Defendant Capital received $2,633,000.00 in provisionally credited funds following its deposit of the Stewart Checks in July 2023.

48.     Capital immediately withdrew the provisionally credited funds, diverting not less than $1,462,000.00 back to Stewart Homes.

49.     Shortly thereafter, the Stewart Checks were returned for insufficient funds and the provisional credits were reversed.  This resulted in an overdraft to the Capital Account. Despite Wells Fargo's demands, defendant Capital has failed to repay Wells Fargo for the $1,407,126.03 negative balance in the Capital Account.

50.      There is now due, owing, and unpaid to Wells Fargo the sum of not less than $1,407,126.03, plus interest at the highest rate permitted by law.

## FIFTH CLAIM FOR RELIEF – MONEY HAD AND RECEIVED

### (Against Defendants Stewart Homes and Amy Stewart, Trustee of Stewart Family Trust)

51.     Wells Fargo realleges and incorporates by reference paragraphs 1 through 50 as though set forth fully herein.

52.     Wells Fargo provisionally credited $2,633,000.00 to the Capital

Account due to the deposit of the Stewart Checks.

53.     Defendant Capital immediately withdrew the provisionally credited funds, diverting not less than $1,462,000.00 back to the drawer of the Stewart Checks, Stewart Homes.

54.     After the Stewart Checks were returned unpaid, Wells Fargo sustained a loss of not less than $1,407,126.03 on the Capital Account.

55.     As a perpetrator of the check kiting scheme, Stewart Homes' principal Michael P. Stewart knew the Stewart Checks would be returned for insufficient funds. Equity demands that Stewart Homes is liable to Wells Fargo for its $1,407,126.03 loss, plus interest at the highest rate allowed by law.

56.     Defendant Amy S. Stewart is the successor trustee of the Stewart Family Trust and, on information and belief, the Stewart Family Trust is the sole shareholder of Stewart Homes.  Because Stewart Homes failed to observe corporate formalities – including commingling corporate assets with assets of the Stewart Family Trust – the interests of Stewart Homes are not separate and distinct from those of the Stewart Family Trust.  Therefore, the Stewart Family Trust is the alter ego of the Stewart Homes.  To avoid unjust enrichment, equity demands that the Stewart Family Trust is jointly and severally liable for the $1,407,126.03 loss to Wells Fargo, along with interest at the highest rate allowed by law.

## SIXTH CLAIM FOR RELIEF—MONEY PAID

### (Against Defendants Stewart Homes and Amy Stewart, Trustee)

57.     Wells Fargo realleges and incorporates by reference paragraphs 1 through 56 as though set forth fully herein.

58.     Wells Fargo provisionally credited $2,633,000.00 to the Capital Account due to the deposit of the Stewart Checks.

59.     Defendant Capital immediately withdrew the provisionally credited funds, diverting not less than $1,462,000.00 back to the drawer of the Stewart Checks, Stewart Homes.

60.     After the Stewart Checks were returned unpaid, Wells Fargo sustained a loss of not less than $1,407,126.03 on the Capital Account.

61.     As a perpetrator of the check kiting scheme, Stewart Homes' principal Michael P. Stewart knew the Stewart Checks would be returned for insufficient funds. Equity demands that Stewart Homes is liable to Wells Fargo for its $1,407,126.03 loss, plus interest at the highest rate allowed by law.

62.     Defendant Amy S. Stewart is the successor trustee of the Stewart Family Trust and, on information and belief, the Stewart Family Trust is the sole shareholder of Stewart Homes.  Because Stewart Homes failed to observe corporate formalities – including commingling corporate assets with assets of the Stewart Family Trust – the interests of Stewart Homes are not separate and distinct from those of the Stewart Family Trust.  Therefore, the Stewart Family Trust is the alter ego of the Stewart Homes.  To avoid unjust enrichment, equity demands that the Stewart Family Trust is jointly and severally liable for the $1,407,126.03 loss to Wells Fargo, along with interest at the highest rate allowed by law.

## SEVENTH CLAIM FOR RELIEF – CONVERSION

### (Against Defendants Stewart Homes and Amy Stewart, Trustee)

63.     Wells Fargo realleges and incorporates by reference paragraphs 1 through 24 as though fully set forth herein.

64.     On information and belief, defendant Stewart Homes knew each of the Stewart Checks were drawn on insufficient funds and would be dishonored. Stewart Homes initiated the check kiting scheme by sending the Stewart Checks to Capital with the intent of receiving checks back that were drawn on the funds that Wells Fargo provisionally credited to the Capital Account.

65.     Before the Capital Checks were dishonored and returned unpaid, the Capital Account received provisional credits totaling $2,633,000.00 from Wells Fargo, pursuant to the Deposit Account Agreement and federal regulations.

66.     Capital was not entitled to use the provisionally credited funds because each of the Stewart Checks were backed by insufficient funds. When Capital wrote a series of checks in July 2023 -- totaling $1,462,000.00 and made payable to Stewart Homes -- Capital was using funds that belonged to Wells Fargo.

67.     Fully aware that the $1,462,000.00 it received from Capital 360 was drawn on provisionally credited funds that would be reversed when the Stewart checks were returned, Stewart Homes converted the provisionally credited funds by accepting the transfers from the Capital Account.

68.     The conversion by Stewart Homes caused Wells Fargo to sustain damages of not less than $1,407,126.03 plus interest at the highest rate permitted by law.

69.    The actions by Stewart Homes were done with a conscious disregard for plaintiff's rights and with a specific intent to defraud and injure plaintiff, which constitutes fraud, oppression, and malice under California Civil Code section 3294. By virtue of this willful and wrongful conduct, Wells Fargo is therefore entitled to recover punitive damages in an amount sufficient to deter Stewart Homes from similar conduct in the future.

70.     Wells Fargo is also entitled to a constructive trust on funds and other assets held by Stewart Homes, the Stewart Family Trust and third parties that are traced to the Stewart Checks.

**EIGHTH CLAIM FOR RELIEF -- VIOLATION**
**OF CALIFORNIA PENAL CODE § 496 (THEFT)**
**(Against Defendant Stewart Homes)**

71.     Wells Fargo realleges and incorporates by reference paragraphs 1 through 24 as though fully set forth herein.

72.     California Penal Code § 496(a) imposes civil liability on a defendant who knowingly "receive(s) any property that has been stolen or that has been obtained in any manner constituting theft or extortion[.]" Pursuant to § 496(c), a

party injured by a § 496(a) violation is entitled to treble damages, costs of suit, and reasonable attorneys' fees from the person(s) who committed the violation.

73.     On information and belief, defendant Stewart Homes knew the Stewart Checks were drawn on insufficient funds and would be dishonored.  Stewart Homes initiated the check kiting scheme by sending the Stewart Checks to Capital with the intent of receiving checks back from Capital that were drawn on the funds that Wells Fargo provisionally credited to the Capital Account.

74.     Stewart Homes' acceptance of each check from Capital in July 2023 constituted a separate violation of California Penal Code § 496(a) because Stewart Homes and Michael Stewart knew the funds received from Capital were stolen property.

75.     These acts by Stewart Homes caused Wells Fargo to sustain damages of not less than $1,407,126.03 plus interest at the highest rate permitted by law.

76.     Pursuant to California Penal Code § 496(c), Wells Fargo is entitled to treble damages against Stewart Homes of not less than $4,221,378.09.

77.     Pursuant to California Penal Code § 496(c), Wells Fargo is entitled to its attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF – UNFAIR BUSINESS PRACTICES
### (Against Defendant Stewart Homes)

78.     Wells Fargo realleges and incorporates by reference paragraphs 1 through 24 as though fully set forth herein.

79.     Based on the foregoing allegations, Wells Fargo maintains that defendant Stewart Homes engaged in unlawful, unfair, and/or fraudulent business practices, in violation of Business & Professions Code section 17200, *et seq*.

80.     The Business & Professions Code applies to any business operating in the State of California.  At all relevant times, Stewart Homes has operated in California as a seller of manufactured homes. The misconduct alleged in this

1  Complaint is precisely the type of activity the Business & Professions Code seeks to

2  redress and prevent.

3       81.    Wells Fargo alleges that Stewart Homes engaged in the following

4  unfair business practices throughout July 2023, in violation of Section 17200, *et seq*.:

5  (i) knowingly writing the Stewart Checks to be deposited into a Wells Fargo deposit

6  account against insufficient funds; (ii) conspiring with Capital to accomplish the

7  check kiting scheme; and (iii) knowingly accepting checks from Capital drawn from

8  the provisionally credited funds.

9       82.    As a direct result of these acts by Stewart Homes, Wells Fargo has

10  suffered damages of no less than $1,407,126.03 due to the negative balance that was

11  created in the Capital Account.

12       83.    As a result of these unfair business acts, Stewart Homes has been

13  unjustly enriched through the receipt of the provisionally credited funds from the

14  Capital Account.  Wells Fargo is therefore entitled to restitution for all sums received

15  by Stewart Homes from Capital during July 2023.

16       84.    Based on the unlawful, unfair, and/or fraudulent business practices of

17  Stewart Homes, Wells Fargo is also entitled to equitable relief including without

18  limitation the imposition of a constructive trust over the assets of Stewart Homes.

19      **TENTH CLAIM FOR RELIEF – DECLARATORY RELIEF**

20       **(Against Defendant David Tofolo)**

21       85.    Wells Fargo realleges and incorporates by reference paragraphs 1

22  through 84 as though set forth in full herein.

23       86.    On information and belief, plaintiff alleges that defendant Tofolo is an

24  investor in Stewart Homes and was a close business associate of Michael P. Stewart.

25       87.    Defendant Tofolo holds a Wells Fargo deposit account ending in

26  #.....7460 (the "Tofolo Account"), which he opened with the execution of a

27  Consumer Account Application on December 21, 2000. (the "Tofolo Application").

28  A true and correct, but redacted, copy of the Tofolo Application is attached as

1   Exhibit 4.

2       88.    By executing the Tofolo Application, defendant Tofolo acknowledged

3   receipt of, and agreed to be bound by, the terms and conditions of the applicable

4   deposit account agreement when the account was opened, and by all modifications

5   to that agreement. The Tofolo Account is presently governed by the Deposit Account

6   Agreement effective November 15, 2022, a copy of which is attached as Exhibit 2.

7       89.    Pursuant to the Deposit Account Agreement, defendant Tofolo agreed

8   that Wells Fargo has the right to setoff funds in the Tofolo Account to satisfy a debt

9   owed to Wells Fargo:

10           **Our setoff rights**: If you owe us any money, we have the right

11           to apply funds in any of your accounts to pay your debt. This is

12           known as setoff. When we exercise this right, we reduce the

13           funds in your account(s) by the amount of the debt that is due . .

14           . . We're not required to give you any prior notice to exercise our

15           right of setoff."

16   (Exh. 2 at p. 39, emphasis in original).

17       90.    On July 11, 2023, defendant Tofolo deposited into the Tofolo Account

18   not less than $1,101,000.00 of checks drawn by Stewart Homes on its Enterprise

19   Bank & Trust account.   Not less than $632,125.71 remains on deposit in the Tofolo

20   Account.

21       91.    Plaintiff Wells Fargo contends that the funds on deposit in the Tofolo

22   Account are, in full or in part, the product of the funds Wells Fargo provisionally

23   credited to the Capital Account for the Stewart Checks. Wells Fargo further contends

24   that it is entitled to a setoff of those funds to partially recover the funds it

25   provisionally credited.

26       92.    On information and belief, defendant Tofolo will contend that Wells

27   Fargo is not entitled to a setoff of the funds in the Tofolo Account.

28       93.    Wells Fargo therefore seeks a determination from the Court that it is

entitled to a setoff of the remaining funds on deposit in the Tofolo Account.

## PRAYER FOR RELIEF

WHEREFORE, Wells Fargo prays for relief as follows:

**ON THE FIRST CLAIM FOR RELIEF**

1.       For damages of not less than $1,407,126.03, plus interest at the highest rate allowed by law.

2.       For attorneys' fees and costs.

**ON THE SECOND THROUGH SIXTH CLAIMS FOR RELIEF:**

3.       For damages of not less than $1,407,126.03, plus interest at the highest rate allowed by law.

**ON THE SEVENTH CLAIM FOR RELIEF:**

4.       For damages of not less than $1,407,126.03 plus interest at the highest rate allowed by law.

5.       For punitive damages.

6.       For the imposition of a constructive trust;

**ON THE EIGHTH CLAIM FOR RELIEF:**

7.       For damages of not less than $1,407,126.03 plus interest at the highest rate allowed by law.

8.       For treble damages of not less than $4,221,378.09.

9.       For attorneys' fees and costs.

**ON THE NINTH CLAIM FOR RELIEF:**

10.       For restitution of not less than $1,407,126.03.

11.       For equitable relief including the imposition of a constructive trust on the assets of Stewart Homes.

**ON THE TENTH CLAIM FOR RELIEF:**

12.       For a judicial determination that Wells Fargo is entitled to a setoff of the funds on deposit in the Tofolo Account.

/ / /

**ON ALL CLAIMS FOR RELIEF:**

13.     For attorneys' fees and costs of suit.

14.     For such further relief that the Court deems just and proper.

Dated:  September 22, 2023                    LAGERLOF, LLP

By: */s/ Mark T. Flewelling*
Mark Flewelling
Attorneys for Plaintiff
WELLS FARGO BANK, N.A.

# EXHIBIT 1

# Business Account Application

**WELLS FARGO**

| | |
|---|---|
| Bank Name: | Branch Name: |
| WELLS FARGO BANK, N.A. | CROWN VALLEY & GREENFIELD |

| | | |
|---|---|---|
| Banker Name: | Officer/Portfolio Number: | Date: |
| LEX MANOLELIS | CM211 | 10/29/2018 |

| | | | |
|---|---|---|---|
| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
| 949/362-1057 | 04598 | 0065839 | E2760-010 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only       [ ] New Deposit Account(s) and Business Credit Card

| | |
|---|---|
| Account 1 Product Name: | Purpose of Account 1: |
| Wells Fargo Business Choice Checking | General Operating Account |

| | | | | |
|---|---|---|---|---|
| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
| 114 | DDA | ▮▮▮▮5167 | $100.00 | INTX |

| | |
|---|---|
| New Account Kit: | Checking/Savings Bonus Offer Available. |
| BC-002536790 | NO |

## Related Customer Information

| | |
|---|---|
| Customer 1 Name: | |
| CAPITAL (360), INC | |
| Enterprise Customer Number (ECN): | Account Relationship: |
| ▮▮▮▮▮▮ | Sole Owner |
| Customer 2 Name: | |
| FRANK ARLASKY | |
| Enterprise Customer Number (ECN): | Account Relationship: |
| ▮▮▮▮▮▮ | Signer |

## Checking/Savings Statement Mailing Information

| | |
|---|---|
| Name(s) and Information Listed on Statement: | Statement Mailing Address: |
| CAPITAL (360), INC | 27462 GRASSLAND DR |
| | Address Line 2: |

| | |
|---|---|
| City: | State: |
| LAGUNA NIGUEL | CA |
| ZIP/Postal Code: | Country: |
| 92677-6032 | US |



Business Account Application

## Customer 1 Information

| | |
|---|---|
| Customer Name: | |
| CAPITAL (360), INC | |

| | |
|---|---|
| Enterprise Customer Number (ECN): | Street Address: |
| ▇▇▇▇▇▇▇ | 27462 GRASSLAND DR |

| | |
|---|---|
| Account Relationship: | Address Line 2: |
| Sole Owner | |

| | | |
|---|---|---|
| Taxpayer Identification Number (TIN): | TIN Type: | Address Line 3: |
| ▇▇▇▇▇▇ | EIN | |

| | | | |
|---|---|---|---|
| Business Type: | | City: | State: |
| Corporation Type S | | LAGUNA NIGUEL | CA |

| | | | |
|---|---|---|---|
| Business Sub-Type/Tax Classification: | Non-Profit: | ZIP/Postal Code: | Country: |
| Corporation | No | 92677-6032 | US |

| | | | |
|---|---|---|---|
| Date Originally Established: | Current Ownership Since: | Number of Employees: | Business Phone: | Fax: |
| 10/17/2018 | | 1 | 949/290-1600 | |

| | | | |
|---|---|---|---|
| Annual Gross Sales: | Year Sales Reported: | Fiscal Year End: | Cellular Phone: | Pager: |
| $75,000.00 | 10/29/2018 | | | |

| | | |
|---|---|---|
| Primary Financial Institution: | Number of Locations: | e-Mail Address: |
| | 1 | |

| | | | |
|---|---|---|---|
| Primary State 1: | Primary State 2: | Primary State 3: | Website: |
| | | | |

| | | | |
|---|---|---|---|
| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: |
| | | | LOCAL |

| |
|---|
| Industry: |
| Construction |

| |
|---|
| Description of Business: |
| FLOORING INVENTORY |

| |
|---|
| Major Suppliers/Customers: |
| |

## Bank Use Only

| | |
|---|---|
| Name/Entity Verification: | Address Verification: |
| Cert of Incorporation | NONE |

| |
|---|
| BACC Reference Number: |
| ▇▇▇▇▇▇ |

| | | | | |
|---|---|---|---|---|
| Document Filing Number/Description: | Filing Country: | Filing State: | Filing Date: | Expiration Date: |
| ▇▇▇▇▇▇ | US | CA | 10/17/2018 | |

| | | | |
|---|---|---|---|
| Country of Registration: | State of Registration: | International Transactions: | Check Reporting: |
| US | CA | | NO RECORD |



Business Account Application

## Owner/Key Individual 1 Information

| | |
|---|---|
| **Customer Name:** FRANK ARLASKY | **Residence Address:** 27462 GRASSLAND DR |
| **Business Relationship:** Owner with Control of the Entity | **Address Line 2:** |
| **Position/Title:** | **Date of Birth:** 11/24/1966 | **Percent of Ownership:** 100.0 | **Address Line 3:** |
| **Enterprise Customer Number (ECN):** ███████ | **City:** LAGUNA NIGUEL | **State:** CA |
| **Taxpayer Identification Number (TIN):** ██████ | **TIN Type:** SSN | **ZIP/Postal Code:** 92677-6032 | **Country:** US |
| **Primary ID Type:** DLIC | **Primary ID Description:** ████████ | **Country of Citizenship:** US | **Permanently Resides in US:** |
| **Primary ID St/Ctry/Prov:** CA | **Primary ID Issue Date:** 11/04/2013 | **Primary ID Expiration Date:** 11/24/2018 | **Check Reporting:** NO RECORD |
| **Secondary ID Type:** OTHR DC | **Secondary ID Description:** WELLS FARGO | |
| **Secondary ID State/Country:** | **Secondary ID Issue Date:** | **Secondary ID Expiration Date:** 11/30/2019 | |



BBG2307 (3-17 SVP)

Page 3 of 4
Wells Fargo Confidential

Business Account Application

## Certificate of Authority

Each person who signs the "Certified/Agreed To" section of this Application certifies that:

**A. The Customer's use of any Wells Fargo Bank, N.A. ("Bank") deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers - Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

(1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

(2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

(3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

(4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers-Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

(1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

(2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

(3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

| Owner/Key Individual 1 Name | Position/Title: |
|---|---|
| FRANK ARLASKY | |

Owner/Key Individual 1 Signature



☐ Submit manually
☐ Signature not required

Date: 10/29/2018

## Authorized Signers - Signature Capture

| Authorized Signer 1 Name | Position/Title: |
|---|---|
| FRANK ARLASKY | |

Authorized Signer 1 Signature



☐ Submit manually
☐ Signature not required

Date: 10/29/2018

# EXHIBIT 2





Effective November 15, 2022

# Deposit Account Agreement

Important legal information and disclosures

# Thank you for doing business with us

This Deposit Account Agreement applies to new and existing consumer and business accounts and, together with the following documents, is your contract with Wells Fargo and constitutes the "Agreement" that governs your account with Wells Fargo:

- The Consumer Account Fee and Information Schedule ("Consumer Schedule") or the Business Account Fee and Information Schedule ("Business Schedule"),
- Our interest rate sheet for interest-bearing accounts,
- Our privacy notice, and
- Any additional disclosures, amendments, or addenda we provide to you.

In this Agreement, when we say "Wells Fargo," "Bank," "we," "us," and "our," we are talking about Wells Fargo Bank, N.A. "You" and "your" means each account owner, authorized signer, and any other person authorized to operate your account. When we say "We may" or "Wells Fargo may" do something, that means you authorize us and agree to such action.

**This Agreement is applicable to new and existing accounts and replaces all prior agreements regarding your account,** including any verbal or written statements or representations. When you sign an account application or use your account, including any account service, you and anyone else identified as an owner or authorized signer on your account consent to the terms of this Agreement. We regularly update this Agreement. You are responsible for ensuring that any authorized signer is familiar with this Agreement. If you keep your account open after we change this Agreement or end a fee waiver, you agree to the changes.

We recommend you keep a copy of this Agreement — and any changes we provide to this Agreement — for as long as your Wells Fargo accounts are open. You can get a copy of the current Agreement at wellsfargo.com, or by visiting your local branch, or by phone at the numbers below.

This document contains various defined terms with specific meanings. Some defined terms are defined within the section in which they are used. More frequently used defined terms are defined in the Glossary at the end of the document. As you review this Agreement, be sure to check the Glossary for those definitions.

# Questions? We're here for you

| | | |
|---|---|---|
| Online | Visit wellsfargo.com or wellsfargo.com/biz | |
| Phone | Consumer Banking<br>**1-800-869-3557** | Business Banking<br>**1-800-225-5935** |
| Deaf or hard of hearing customers | We accept all relay calls, including 711. | |
| Mail | Wells Fargo, Customer Correspondence<br>P.O. Box 6995<br>Portland, OR 97228-6995 | |

Deposit Account Agreement

# Table of Contents

**Opening Accounts** ...................................................................................................................**4**

**Depositing Funds** ....................................................................................................................**5**

**Availability of Funds Policy** ..................................................................................................**7**

**Available Balance, Posting Transactions, and Overdraft** .................................................**9**

    Available balance ..................................................................................................................**9**

    How we process and post transactions to your account.........................................................**9**

    Standard overdraft coverage...............................................................................................**10**

    Debit Card Overdraft Service ..............................................................................................**11**

    Overdraft Protection ...........................................................................................................**11**

    Extra Day Grace Period........................................................................................................**11**

**Debit Cards and ATM Cards** ...............................................................................................**12**

**Fund Transfer Disclosures — General** ..............................................................................**18**

**Electronic Fund Transfer Services (Consumer accounts only)** .....................................**20**

**Other Account Services and Restrictions** ........................................................................**23**

**Time Accounts (CDs)** ...........................................................................................................**25**

**Protecting Your Account and Your Information** ...............................................................**26**

**Statements, Interest, and Other Account Information** ....................................................**28**

**Closing Accounts** .................................................................................................................**33**

**Resolving Disputes Through Arbitration** ........................................................................**35**

    Consumer Accounts Only: Resolving Disputes Through Arbitration.......................................**35**

    Business Accounts Only: Resolving Disputes Through Arbitration........................................**36**

**Additional Terms and Services** ..........................................................................................**38**

**Glossary** ...............................................................................................................................**40**

# Opening Accounts

This section applies to consumer accounts only unless otherwise noted.

**Forms of account ownership**

You can open an account that you own alone, or with more than one person. If the account is owned with more than one person, it's considered a joint account.

**Different types of joint account ownership**

**For joint accounts,** we treat all owners, who are referred to in this Agreement as "co-owners," as joint tenants with right of survivorship (described below), unless:

- Applicable state laws require other treatment, or
- We agree with you in writing that the account is owned in some other way.

Regardless of how your account is owned, we don't keep a separate record of each co-owner's interest in the account. We act on instructions from any co-owner (or a co-owner's authorized representative) without obtaining other co-owner's consent, including withdrawing or transferring funds, making payments, or closing the account.

Each co-owner has complete control over all of the funds in the account. We may pay out money from the account upon the request or direction of any co-owner (or a co-owner's authorized representative), regardless of their contributions to the account, and whether any other co-owner is incapacitated or deceased, or whether the account includes a right of survivorship.

**Joint tenants with right of survivorship:** When you hold an account as joint tenants with right of survivorship and one person dies, the account is owned by and payable to the surviving co-owners; this is subject to our rights under this Agreement.

**Tenants-in-common:** When you hold an account as tenants-in-common and one owner dies, the account is payable in whole or in part to any surviving co-owner or the deceased owner's authorized representative, heirs, or successors. This is subject to our rights under this Agreement.

**Community property:** An account is held as community property under state law when spouses have equal and undivided interests in the account during their lifetimes. When one spouse dies, ownership does not automatically pass to the survivor; rather, the deceased spouse can pass his or her interest through a will. Community property does not exist in every state.

**Joint owners and responsibility for liabilities on your account**

Each joint owner is individually and jointly responsible for any overdraft on your account, regardless of who caused or benefited from the overdraft. If there's a setoff, an enforcement of our security interest in your account, or legal action (such as a third party garnishment, seizure, forfeiture, or tax levy) affecting any co-owner, we may treat all funds in the account as belonging to the customer against whom the setoff, enforcement of the security interest, or other legal action is directed. If your account is closed for unsatisfactory handling, we may report all joint owners to the consumer reporting agencies.

**Pay On Death (POD) account**

A POD account is payable to the surviving beneficiaries you designated on your account when we receive proof of your death or the death of the last surviving co-owner. An account titled "in trust for (ITF)," "transfer on death (TOD)," or similar language is treated as a POD account.

You and any co-owner may change beneficiaries anytime by notifying us in writing. Generally, the beneficiary(ies) must survive all owners in order to receive funds.

**Accounts established for minors**

**Uniform Transfers/Gifts to Minors Act account.** An account established under a state's Uniform Transfers/Gifts to Minors Act that is controlled by a custodian (an adult who holds the minor's funds in the account for safekeeping). We may disclose account information to the minor or their authorized representative. When the minor reaches the age established by the UTMA/UGMA laws in your state, we may pay the funds in the account to the minor without waiting for instructions from the custodian.

**Minor by account.** One or more adults may open an account, as custodian (an adult who holds the minor's funds in the account for safekeeping) in the name of a minor. The minor owns the funds in the account. The adult, as the custodian, has exclusive control of the account and the minor cannot make deposits, withdrawals or transact on the account. If there's more than one adult as the custodian on the account, each may act independently. We're not obligated to inquire about the use of the funds. When the minor reaches the age of majority, they still will not be able to make deposits, withdrawals or transact on the account except to close the account. If the adult as the custodian (or the last of the adults as the custodian to survive) dies before the minor reaches the age of majority, we may transfer the funds to a successor custodian according to the applicable Uniform Transfers/Gifts to Minors Act.

**Transfer of account ownership**

If you want to transfer account ownership to another person, we must consent and note it in our records before the transfer is valid and binding on us; however, we're not responsible for determining whether such transfer is legally valid. Assignment of your account is subject to our setoff rights (see Setoff and security interest in the "Additional Terms and Services" section). This Agreement is binding on your personal representatives, executors, administrators, and successors, as well as our successors and assigns.

**When an owner does not sign account documentation**

**Applies to both Consumer and Business Accounts:** If a customer identified in our records as an owner or a co-owner of an account does not sign any account-related documentation (including the account application), we still may treat them as an owner or a co-owner of that account, in our sole discretion; we're not liable to anyone as a result.

**Death or legal incompetence of an authorized signer or account owner**

Please notify us promptly if you learn or suspect an account owner or signer has been declared incompetent by a court or other legal authority, or has died. When we receive proper notice, we may:

- Freeze the account until we receive documents verifying the incapacity or death and instructions regarding the funds remaining in the account,
- Pay (without inquiring) any item authorized by the account owner before being declared legally incompetent or deceased,
- Return or reverse deposits, and
- Apply funds in the account to any debt the account owner owes us before recognizing the rights of a surviving joint owner or other person to any remaining funds.

If we release funds after the account owner's death and have to pay tax or reclamation claims to a government agency as a result, the account owner's estate is responsible for reimbursing us.

**Consumers and Sole Proprietors Only:** If an account owner dies or is declared legally incompetent, we may comply with court orders and legal documents, and take direction from affiants, court-appointed representatives, guardians, or conservators from your state of residence, even if different than where the account was opened except as otherwise required by applicable law or court order. We may require additional documentation be provided to us before complying with the directives. We may require U.S. court documents for customers residing outside of the U.S. at the time of incompetence or death.

**For Business Account Owners:** Businesses must provide us documentation of any change in ownership or control of a business upon the death or legal incompetence of a business owner.

# Depositing Funds

**There are many ways for you to deposit funds into your account: at branches, ATMs, via Bank by Mail, and through the Wells Fargo Mobile® app. You should be aware of your responsibilities when you make deposits.** We exercise ordinary care when collecting a deposited item but are not responsible for any other bank's treatment or loss of the item. If a deposited item is lost or destroyed during processing or collection, you agree to provide all reasonable assistance to help us reconstruct the item.

**Deposit accuracy**

**It's your responsibility, not ours, to confirm the accuracy of the amount you deposit.** If we determine a discrepancy exists between the declared and the actual amount, we may debit or credit your account and we may notify you if any adjustments are made. We can also use the declared amount as the correct amount to be deposited and not adjust a discrepancy if it's less than our standard adjustment amount. We may vary our standard adjustment amount from time to time without notice and use different amounts depending on account type.

**Analyzed business accounts:** You may request that the Bank adjust deposit discrepancies identified during any verification regardless of the standard adjustment amount.

**Notify us of a discrepancy.** You must notify us within the applicable timeframe below or we may consider the deposit correct.

| | |
|---|---|
| **Consumer accounts** | within 1 year after we have made your account statement available to you |
| **Business accounts** | within 30 days after we have made your account statement available to you |

**If you fail to notify us in a timely manner:** If the actual deposit is less than the amount on the statement, the difference is your property; if the actual deposit is more, the difference is the Bank's property.

**Verifying transactions**

We don't verify all transactions but have the right to verify any, including those for which we have provided a receipt. We may reverse or adjust, at any time without prior notice to you, any debit or credit we believe we have made to your account by mistake.

**Sending an item for collection**

We may, upon notice to you, send an item for collection instead of treating it as a deposit. This means we send it to the issuer's bank for payment, and your account won't be credited for the item until we receive payment. Our availability of funds policy does not apply to an item we accept for collection.

**Our right to decline deposits**

**We may decline all or part of a deposit, including cash, for any reason.** This could happen, for example, if a payee isn't a co-owner, authorized signer, or authorized representative on your account, we can't verify an endorsement, the check was issued from a credit account, the dollar amount of the deposit, the check looks suspicious, or it's a non-U.S. item. If we decline a deposit that you mailed to us, we may return it to you at your cost (including charging you for postage and handling to return foreign currency coin or paper), or retain any invalid checks or other documents included in the deposit without crediting your account, at our discretion.

If we cannot verify an endorsement, we can also decline to pay, cash, or send the item for collection. We can require that all endorsers be present and that you deposit the item instead of cashing it.

Non-account owners are not allowed to deposit cash into consumer accounts. For business accounts, any person wanting to make a cash deposit must provide an acceptable form of identification before we accept a cash deposit.

**Requirements for correct endorsement**

An endorsement is a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check. If you have not endorsed a check that you deposited to your account, we may endorse it for you. Any endorsement must be in the 1-1/2 inch area that starts on the top of the back of the check. Do not sign or write anywhere else on the back of the check.

**Restrictions on checks are not binding**

We are not obligated to follow restrictions or notations written on a check such as, "void after six months," "void over $50," or "payment in full." You're responsible for any resulting loss or expense we incur.

**Substitute checks**

A substitute check is created from an original check; under federal law, it's legally equivalent to the original check and can even be used as proof of payment. A substitute check contains an accurate copy of the front and back of the original and bears the legend: "This is a legal copy of your check. You can use it the same way you would use an original check." Any check may be returned to you in the form of a substitute check. You agree that you won't transfer a substitute check to us, by deposit or otherwise, if we would be the first financial institution to take the substitute check, unless we have expressly agreed in writing to take it.

**Our handling of non-U.S. items**

A non-U.S. item is an item:

- Payable in a currency other than U.S. dollars,
- Drawn on a financial institution that isn't organized under U.S. law, or
- That is an incoming funds transfer remitted in a currency other than U.S. dollars.

We're not required to accept a non-U.S. item for deposit or collection, but we may accept it on a collection basis without your specific instruction to do so. We can reverse any amount we have credited to your account and send the non-U.S. item on a collection basis even if we have taken physical possession of the item.

If we accept a non-U.S. item, the U.S. dollar amount you receive for it will be determined by the applicable exchange rate that is in effect at the time of deposit or our receipt of final payment (less any associated fees) of the non-U.S. item. If the deposited non-U.S. item is returned for any reason, **we'll charge the amount against your account (or any other account you maintain with us)** at the applicable exchange rate in effect at the time of the return. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Statements, Interest, and Other Account Information" section of this Agreement. Our availability of funds policy does not apply to a non-U.S. item.

**Cashed/Deposited items returned unpaid**

If an item you deposited or cashed is returned to us unpaid, **we can deduct the amount from any account you have with us**. We can do this when we're notified that the item will be returned and don't need to receive the actual item. We can do this even if the balance in your account isn't sufficient to cover the amount we hold or deduct, causing an overdraft. In addition, we'll charge you all applicable fees and reverse all interest accrued on the item.

**We may place a hold on or charge your account for a deposit if a claim is made or we otherwise have reason to believe the deposited item was altered, forged, unauthorized, missing a signature or has a forged endorsement, or should not have been paid for any other reason.** When the claim is resolved, we'll either release the hold or deduct the amount of the item from your account. We're not responsible if we take, or fail to take, any action to recover payment of a returned deposited item.

**Breach of a warranty associated with an item**

If you breach any warranty you make to us under the laws governing your account with respect to any item, you won't be released or discharged from any liability for the breach so long as we notify you of the breach within 120 days after we learn of the breach. If we fail to notify you within this 120 day period, you'll be released from liability and discharged only to the extent our failure to notify you within this time period caused a loss to you.

**Reversal of an electronic payment**

If an electronic payment credited to your account, such as a direct deposit, is reversed, **we can deduct the amount from any account you have with us,** at any time, without notifying you. You agree to promptly repay any resulting overdrafts.

**Bank By Mail**

You can make deposits to your account(s) by mail, although we cannot accept cash or foreign checks by mail. Call us to request a Bank By Mail deposit kit.

If you need to send deposits before your kit arrives, write on the back of the check "for deposit only, Wells Fargo" and include the account number to which the check should be deposited, and mail to:

Wells Fargo
P.O. Box 77200
Minneapolis, MN 55480-7720

For accounts located in **Alaska**, send deposits to:

Wells Fargo
P.O. Box 77040
Minneapolis, MN 55480-7740

**Early Pay Day**
(Consumer accounts only)

For certain eligible direct deposits, we may make funds available for your use up to two days before we receive the funds from your payor. When funds are made available early, they will be reflected in your account's available balance. Whether we make funds available early depends on (1) when we receive the payor's payment instructions, (2) any limitations we set on the amount and frequency of early availability, and (3) standard fraud prevention screening. The criteria we use for making funds available early is determined at our sole discretion, based on confidential criteria necessary for maintaining the security of your account and our payment services, and is subject to change without notice.

Not all direct deposits are eligible for Early Pay Day. Eligible direct deposits are limited to electronic direct deposits such as your payroll, pension, and government benefit payments. Other deposits or credits to your account, such as deposits of funds from person-to-person payments services (e.g., Zelle®, Venmo, or PayPal transfers), check or mobile deposits, and other online transfers are not eligible for Early Pay Day. The Bank does not guarantee that any direct deposits will be made available before the date scheduled by the payor, and early availability of funds may vary between direct deposits from the same payor. For interest-bearing accounts, interest on your incoming direct deposit will begin accruing on the business day we receive credit for the deposit from your payor's bank. Direct deposits made available early with Early Pay Day will not count towards applicable options to avoid your account's monthly service fee until the deposit posts to your account and is no longer pending (e.g., the pay date scheduled by your payor). If a direct deposit is not made available early, it will be made available in accordance with our Availability of Funds Policy described in this Agreement. Except as expressly set forth herein, funds made available early are subject to the same terms and conditions as other deposits to your account.

If we've made funds available early and the payor reverses or requests a return of the deposit, or the funds are otherwise uncollected by the Bank, you understand and agree that we may debit your account up to the amount of the deposit that was previously made available – even if you have already withdrawn the funds or it creates an overdraft on your account. In this instance, you are responsible for any fees assessed – including those charged by merchants or third parties – as a result of the overdraft. Early Pay Day is offered at the discretion of the Bank, and we reserve the right to cancel the service at any time and without notice to you.

# Availability of Funds Policy

**Your ability to withdraw funds**

Our policy is to make funds from your check deposits to your checking or savings account (in this policy, each account) available to you on the first business day after the day we receive your deposits. Incoming wire transfers, electronic direct deposits, cash deposited at a teller window and at a Wells Fargo ATM, and the first $400 of a day's check deposits at a teller window, at a Wells Fargo ATM, and with the Wells Fargo Mobile Banking app will be available on the day we receive the deposits. Certain electronic credit transfers, such as those through card networks or funds transfer systems, will be available on the day we receive the transfer. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks and other items presented for payment and applicable fees that you have incurred.

**Determining the day your deposit is received by the Bank**

**For determining the day your deposit is received by the Bank**, every day is a business day, except Saturday, Sunday, and federal holidays. If you make a deposit before our established cutoff time on a business day that we are open, we will consider that day to be the day your deposit is received by the Bank. However, if you make a deposit after our cutoff time or on a day we are not open, we will consider the day your deposit is received by the Bank to be the next business day we are open.

Our deposit cutoff times are as follows:

| Type of Deposit | Cutoff time |
| --- | --- |
| In branch | when the branch closes for business; varies by location |
| At Wells Fargo ATMs | 9 p.m. local time (Alaska 8 p.m.) |
| Checks deposited with the Wells Fargo Mobile app | 9 p.m. Pacific Time |
| Electronic credits (such as direct deposits) | 8 p.m. Pacific Time |

**Longer delays may apply**

In some cases, we will not make the first $400 of a business day's check deposits available to you on the day we receive the deposits. Further, in some cases, we will not make all the funds that you deposit by check available to you on the first business day after the day of your deposit.

Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $225 of your deposit, however, may be available on the first business day after the day of your deposit.

Except as otherwise explained in this paragraph, if we are not going to make all funds from your deposit available on the business day of deposit or the first business day after the day of deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to a Wells Fargo employee, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after we receive your deposit.

If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

• We believe a check you deposit will not be paid
• You deposit checks totaling more than $5,525 on any one day
• You redeposit a check that has been returned unpaid
• You have overdrawn your account repeatedly in the last six months
• There is an emergency, such as failure of computer or communications equipment

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. The funds will generally be available no later than the seventh business day after the day of your deposit.

**Special rules for new accounts**

**If you are a new customer, the following special rules apply during the first 30 days your account is open.** Incoming wire transfers, electronic direct deposits, and cash deposited at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposit. Funds from your check deposits will be available on the business day after the day we receive the deposits; no funds from a business day's check deposits are available on the day we receive the deposits.

If we delay the availability of your deposit the following special rules may apply:
• **The first $5,525** of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks, and U.S. Postal Service money orders made payable to you will be available on the first business day after the day of your deposit, if your deposit meets certain conditions. For example, the checks must be payable to you. If your deposit of these checks (other than U.S. Treasury checks) is not made in person to one of our employees, the first $5,525 may not be available until the second business day after the day of your deposit.
• **The excess over $5,525** and funds from all other check deposits will be available no later than the seventh business day after the day of your deposit. The first $225 of a day's total deposit of funds from all other check deposits, however, may be available on the first business day after the day of your deposit.

We will notify you if we delay your ability to withdraw funds and we will tell you when the funds will be available.

**Holds on other funds**

**If we cash a check for you that is drawn on another bank**, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cash would have been available if you had deposited it.

**If we accept a check for deposit that is drawn on another bank**, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available until the time periods that are described in this policy.

# Available Balance, Posting Transactions, and Overdraft

**Available balance**

Your account's available balance is our most current record of the amount of money in your account available for your use or withdrawal. We use the available balance to authorize your transactions during the day (for example, debit card purchases and ATM withdrawals). We also use the available balance to pay your transactions during our nightly processing. **Your available balance is calculated as follows:**

| | | |
|---|---|---|
| | **Ending Daily Balance** | Ending daily balance from prior business day's nightly processing |
| **−** | **Holds** | Subtract funds that have been placed on hold |
| **+** | **Deposits** | Add pending deposits that are immediately available (see "Availability of Funds Policy" in previous section) |
| **−** | **Withdrawals** | Subtract pending withdrawals that we have either authorized or we know about but have not yet processed |
| **=** | **Available Balance** | |

**The available balance may not include every transaction you have initiated or that we previously authorized.** For example, your available balance may not include the following:

- Outstanding checks and authorized withdrawals we have not received for payment (such as recurring debit card transactions and ACH transactions);
- The final amount of a debit card purchase. For example, we may authorize a purchase amount prior to a tip that you add;
- Debit card transactions that have been previously authorized but not sent to us for payment. In most cases, a transaction authorization hold must be released after three business days even though the transaction may be sent to us for payment from your account at a later date, which we must honor. The authorization hold may be up to 30 business days for certain transactions, including car rental, cash, and international transactions.

**How we process and post transactions to your account**

We process transactions each business day (not Saturdays, Sundays, or federal holidays) during a late night process that includes **three key steps**. We call this nightly processing. Once the transactions are processed, the results are posted to your account.

## Step 1: **We calculate the available balance in your account that can be used to pay your transactions as described above.**

**Certain pending transactions can impact your available balance for purposes of determining whether we will pay other transactions during our nightly processing, including**:

- Cash deposits or transfers from another Wells Fargo account made AFTER the applicable cutoff time will be added to your available balance only if they are made before we start our nightly processing; and
- Pending withdrawals that reduce your available balance, such as debit card transactions we have authorized.

## Step 2: **We sort your transactions into categories.**

- **+** **We credit deposits** received before the cutoff time.
- **−** **We subtract withdrawals and payments we have previously authorized that we cannot return unpaid** such as debit card purchases, ATM withdrawals, account transfers, Bill Pay transactions, and teller-cashed checks. Transactions are generally sorted by date and time the transaction was conducted or, for some transactions, the day we receive it for payment or the time assigned by our system. If date and time are the same, we post from lowest to highest dollar amount.
- **−** **We pay your checks and preauthorized automatic ACH payments** such as recurring bills you have authorized a company to withdraw. Transactions are sorted by date and time received by the Bank, and if date and time are the same, we post from lowest to highest dollar amount.

### Determining Date and Time

- Cutoff time is based on the location where the deposit or transfer was made.
- If a merchant does not seek authorization at the time of a debit card transaction or we receive it for payment more than 10 business days later, we'll use the date the transaction is received for payment.
- For some transactions, such as Bill Pay or teller-cashed checks, a different time may be assigned by our systems.

**Step 3**: If the available balance is **not enough to pay all of your transactions,** we:

- **Use Overdraft Protection** (if you have it) by transferring and/or advancing available funds from a linked savings and/or credit account.
- **Then, decide whether to pay your transactions presented to us for payment into overdraft, or return them unpaid**. Paying an item into overdraft means that we pay an item even though your available balance is not sufficient to cover that item, resulting in your account having a negative balance. Returning an item unpaid means that we do not pay your transaction. At our discretion, we may pay a check or automatic bill payment into overdraft, rather than return it unpaid. This is our **standard overdraft coverage (see more information below)**. Debit card transactions presented to us for payment (whether previously authorized by us or not) **will be paid into overdraft and won't be returned unpaid**, even if you don't have sufficient funds available in your account.
  - For business accounts, any applicable overdraft fees are deducted from your account on the morning of the next business day.
  - For consumer accounts, overdraft fees for items paid into overdraft are subject to our Extra Day Grace Period (described below) and, if applicable, deducted from your account at the end of the next business day's nightly processing.

**Pending transactions can result in overdrafts.** If your available balance during the nightly processing is insufficient, the Bank may assess overdraft fees on transactions we pay into overdraft. Even if a pending transaction has been dropped from your account, we must pay it when we receive it for payment. Sometimes, previously authorized transactions may be paid into overdraft if other transactions have reduced your available balance before the pending transactions are sent to us for payment. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

**To minimize the number of overdraft fees you may be assessed**, we track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If the pending transactions are then presented for payment within 10 business days after they first appeared as pending, **we'll waive any overdraft fees on those transactions**. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when originally sent for authorization and we're unable to match them. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

## Standard overdraft coverage

The bank typically does not pay overdrafts if your account is overdrawn or you have had excessive overdrafts.

Except for Clear Access Banking℠, all checking accounts come with **standard overdraft coverage**. Under standard overdraft coverage:

- We **may** authorize and pay checks, other transactions using your account number, and automatic bill payments (such as recurring debit card and ACH transactions) into overdraft and charge a fee.
- We **will not** authorize ATM and everyday (one-time) debit card transactions into overdraft, unless your account is enrolled in Debit Card Overdraft Service as described below.

The decision to pay a transaction into overdraft is made at our sole discretion.  Generally, we base this decision on criteria such as your account history, deposits you make, and the transaction amount.  We reserve the right to not pay a transaction into overdraft.

You can remove standard overdraft coverage from your account at any time. If you remove it, the following will happen if you don't have enough available money in your checking account or in accounts linked for Overdraft Protection to cover a transaction when it is presented to us for authorization or payment:

- We **will** return your checks and other returnable items, such as ACH payments, as unpaid.
- We **will not** authorize certain transactions such as cashed checks, recurring debit card transactions, or Bill Pay transactions into overdraft. **Important:** if these transactions are authorized when your account has enough available money but are later presented for payment when your account does not have enough available money, we'll pay the transaction into overdraft and charge an overdraft fee.
- We **will not** authorize ATM and everyday (one-time) debit card transactions (such as one-time debit card and ATM card purchases) into overdraft. If your account is enrolled in Debit Card Overdraft Service, the service will also be removed.

You understand that the classification of a debit card transaction (except ATM transactions) as recurring or non-recurring (i.e., one-time) is determined by merchants, other institutions, or other third parties before the transaction is presented to us for authorization or payment. We will treat and process such debit card transactions in the manner they are presented to us, which may result in a one-time debit card transaction presented as recurring preauthorized transactions and vice versa.

**Important:** Standard overdraft coverage, including applicable overdraft fees, does not apply to Clear Access Banking accounts. For more information about Clear Access Banking, refer to your Consumer Schedule.

## Debit Card Overdraft Service

Consumer account customers may choose to enroll in this service; business accounts are automatically enrolled at account opening.

**Your enrollment preference for Debit Card Overdraft Service determines how the Bank handles your ATM and everyday (one-time) debit card transactions** on eligible accounts. You can add or remove the service on eligible accounts at any time. It's important to understand that this service is unique from other optional services that may be less costly for you, such as our optional Overdraft Protection plan described in the next section.

When you don't have enough available money in your checking account or accounts you have linked for Overdraft Protection at the time of an ATM or everyday (one-time) debit card transaction:

- **If you're enrolled in Debit Card Overdraft Service,** the transaction may be authorized into overdraft at the Bank's discretion but **an overdraft fee applies.** If you cover the shortage by the posted cutoff time on the same business day as the transaction, no overdraft fee is assessed.
- **If you aren't enrolled in Debit Card Overdraft Service,** the transaction will be declined and no fees apply. If a previously authorized transaction creates a negative balance when it posts, you won't be assessed an overdraft fee.

Debit Card Overdraft Service **does not apply** to checks and other recurring transactions (such as Bill Pay or ACH transfers, or recurring debit card transactions such as utilities or health club memberships). With or without Debit Card Overdraft Service, the Bank may continue to pay these other transaction types into overdraft, at our discretion, and our standard overdraft fees and policies will apply.

Debit Card Overdraft Service **isn't available for certain accounts**, such as Clear Access Banking accounts, Teen Checking℠ accounts, IOLTA/RETA accounts, accounts for government entities, or savings accounts. Debit Card Overdraft Service is a discretionary service that may be removed by the Bank for a variety of reasons including excessive overdrafts or returned items.

## Overdraft Protection

This is an optional service you can add to your checking account by **linking up to two eligible Wells Fargo accounts (one savings, one credit) to authorize or pay your transactions if you don't have enough available money in your checking account**. Overdraft Protection transfers/advances may occur to cover pending transactions, even if these transactions are not subsequently presented for payment. When an Overdraft Protection transfer occurs from a linked savings account to cover a transaction, the available balance in that savings account will be reduced by the amount of money to be transferred. That amount of money will be unavailable for other use, and it will be applied to the checking account the next business day. If you link two accounts, you may tell us which account to use first to transfer/advance funds. If you don't specify an order, we'll first transfer funds from your linked savings account. Overdraft Protection isn't available for all accounts. Refer to the Consumer Schedule or the Business Schedule for account eligibility and additional details.

## Extra Day Grace Period

(Consumer accounts only)

With Extra Day Grace Period, if your account is overdrawn, you have an additional business day (extra day) to make covering deposits and/or transfers to avoid overdraft fees. If your available balance as of **midnight Eastern Time** on any business day is enough to cover the prior business day's overdraft items, the pending overdraft fees for those items will be waived. If your available balance as of midnight Eastern Time is enough to cover some, but not all, of the prior business day's overdraft items, the available balance will be applied to the transactions in the order they posted to your account (based on our posting order practices described in this Agreement). Any overdraft items that are not fully covered by midnight Eastern Time on your extra day are subject to applicable overdraft fees. Note: deposits and transfers received by 9 a.m. local time on your extra day (based on where your account is located, as noted on your account statement) may also result in us reversing the prior business day's returned item decision and paying the transaction(s).

Keep in mind that your available balance includes your deposits and transfers, less any pending withdrawals and debits. Deposits and transfers of funds are also subject to the Bank's Availability of Funds policy described in this Agreement, including any applicable deposit holds or cutoff times that may impact your available balance. If you're enrolled in Online Banking we will generally alert you on the morning of your extra day to any overdraft items that must be covered to avoid pending overdraft fees, so long as you have not opted out of receiving such alerts. Alerts are sent as a courtesy and may be delayed or prevented by factors affecting your internet/phone provider or other circumstances beyond the control of the Bank. The Bank has no liability arising from non-delivery, delayed delivery, or erroneous delivery of any alert. It is important for you to keep and rely on a personal record of your transactions to know when your account is overdrawn for purposes of making covering deposits or transfers during your extra day.

## Returning your account to a positive balance

**If your account has an overdraft, you must promptly add money to return your account to a positive balance.** If you don't return your account to a positive balance or you have too many overdrafts, we may close your account. We will generally close and charge off an overdrawn account 60 days after it first became overdrawn, but reserve the right to close it at an earlier date, as permitted by law. In this event, it is important that you make arrangements to redirect recurring deposits and payments to another account. Also, we may report you to consumer reporting agencies and initiate collection efforts. You agree to reimburse us for the costs and expenses (including attorney's fees and expenses) we incur to do so.

When funds are deposited or credited into an account with an overdraft, you authorize us to apply those funds to the overdraft and related fee(s) in the account. This applies and extends to the deposit of any federal or state benefit payments, including Social Security benefits. You understand and agree that if you don't want your benefits applied in this way, you can change your direct deposit instructions at any time with the person or organization paying the benefits.  For information about our rights to apply funds from other accounts you hold with us to pay an overdraft and related fee(s), see the section of this Agreement titled Setoff and Security Interest.

# Debit Cards and ATM Cards

We offer a number of account services at a variety of locations that involve using a card. Some services may not be available at all locations. When you get a debit or ATM card from us, you'll receive, and be required to agree to, additional terms and conditions applicable to the card. In the event of a conflict between the terms and conditions and this Agreement, the terms and conditions will control. Additional disclosures applicable to these services are provided in the Consumer Schedule or Business Schedule, as applicable. When you use your debit or ATM card, you authorize us to act on your instructions that we receive through any ATM, merchant or network in which we participate.

**Issuance of a card and Personal Identification Number (PIN)**

We may issue a card to each account owner to access your accounts. If you don't select a PIN when you request your card, we'll send a randomly selected PIN. If you don't request a card but would like a PIN for authentication purposes, we can provide a PIN for only that purpose (a "cardless PIN"). A cardless PIN cannot be used for purchases or ATM access (see "Telephone banking services" section for more details).

You should securely protect your card and PIN from loss or theft. Each cardholder must have his or her own unique PIN and is responsible for keeping the PIN confidential.  If the card or PIN is given to another person, the account owner will, to the extent allowed by applicable law, be responsible for all transactions made by that person or anyone else to whom that person gives the card or PIN.

**Using a card to access linked asset accounts**

Non-Wells Fargo ATM operators may not support display of all linked accounts, and may not support all functions.

Linking lets you add asset accounts you own (for example, checking or savings) to a debit or ATM card, giving you the ability to perform transactions on multiple accounts with one card at Wells Fargo ATMs. The money for purchases and payments made with your card is deducted from the primary linked account. Using a card at a participating non-Wells Fargo ATM for cash withdrawals, balance inquiries, and funds transfers is generally available for the primary linked checking and savings accounts. We can restrict the number and type of asset accounts you can link to your card.

Some Wells Fargo ATMs in branches can operate in "Assisted-Service mode" during branch hours. When in Assisted-Service mode, the ATM screen's main menu will display an "I need assistance" option. When using a Wells Fargo ATM in Assisted-Service mode, you may be able to use your consumer card to access and perform transactions on your consumer accounts that are not linked to your card.

**If you link more than one asset account to the card, you may designate a primary linked account.**
If you don't designate a primary linked account, the first account linked to your card is considered the primary linked account. The primary linked account for a consumer debit card must be an eligible consumer checking account. The primary linked account for a business debit card must be an eligible business checking account.

If a primary linked account is closed or delinked for any reason, we'll generally designate a linked secondary account of the same account type, if you have one, as the new primary account. If you have a debit card and none of your other linked accounts are checking accounts, or you have no other linked accounts, your debit card will be closed and you can request an ATM card. You may link a new primary account of a different type (consumer, business, individual brokerage, or commercial brokerage) than the previous primary linked account. Depending on the new primary linked account, you may be issued a new card type. (Note: for Wells Fargo campus debit and ATM cards with school access, your banking access will be closed but your card can still be used for school access).

When you use your card to access any asset account, the agreements and disclosures applicable to that asset account will apply to that card transaction. Additionally, the consumer protections described in the "Electronic Fund Transfer Services" section of this Agreement don't apply to transactions on business or commercial brokerage accounts.

**Using a card to access linked credit card and line of credit accounts at ATMs**

If you link your Wells Fargo credit card account or eligible line of credit account (linked credit account) to your debit or ATM card, you may use the card to access the linked credit account at any Wells Fargo ATM. You can use the card to obtain cash or transfer funds from the linked credit account, as long as the linked credit account is in good standing and has available credit. Cash withdrawals and transfers of funds from your linked credit account are treated as cash advances. Each of these transactions is subject to the applicable credit card account agreement or line of credit account agreement, including daily limits and cash advance fees.

**Using your card**

There are many ways to use your debit and ATM[1] cards—using the physical cards or via mobile devices. See the following descriptions.

**You can use your debit and ATM cards:**

- At merchants who accept payments through a network in which we participate
- To request cash back when making a physical card purchase with your PIN at merchants who offer this service
- To choose whether and how you receive a receipt when you use your card at a merchant terminal

**In addition, with your debit card, you can also:**

- Pay for purchases, or pay bills directly with your card, or through a mobile device at participating merchants (see "Using your card through a mobile device" for more details)

**At any ATM with your debit or ATM card you can:**

- Withdraw cash, view account balances, and  transfer funds between your accounts (fees may apply on any of these actions at a non-Wells Fargo ATM[2])

**At Wells Fargo ATMs ONLY you can:**

- Make deposits to your account[3]
- Transfer funds from your eligible Wells Fargo credit accounts to your checking or savings accounts[4]
- Make payments to your eligible Wells Fargo credit accounts
- Get a statement[5] of your account balances or the last 10 transactions
- Choose how you want to receive your ATM receipt: printed, emailed, or to your mobile phone
- Use your debit card through your mobile device to perform the ATM transactions listed above

**In addition, with your debit card but not your ATM card, you can:** Receive electronic credit transfers, such as those through card networks or funds transfer systems[6]

[1] Purchases using an ATM card are only available at merchants who accept payments through networks in which we participate and require a PIN to authorize the purchase.

[2] Non-Wells Fargo ATMs are ATMs that are not owned or operated by Wells Fargo and not prominently branded with the Wells Fargo name and logo. You can use your card at non-Wells Fargo ATMs that display the Plus® logo to withdraw cash, check balances, and transfer funds between the accounts linked to your card as primary checking and primary savings. Note: 1) Some non-Wells Fargo ATMs may not give you the option of choosing which account to access or may only let you access one of these two accounts. 2) Some transactions may not be available at all ATMs, may be different from those available at Wells Fargo ATMs, or may be limited to any withdrawal limit(s) set by the non-Wells Fargo ATM.

[3] A business deposit card can be issued to an authorized signer on business accounts. It can also be issued to a non-authorized signer at the request of an authorized signer. At Wells Fargo ATMs, a business deposit card and associated PIN can only be used to make ATM deposits, and can only be linked to deposit accounts. When the card is used to make an ATM deposit, account balances are neither displayed on the ATM screen nor printed on the ATM receipt. The card PIN cannot be used for authentication for phone or online access.

[4] Cash advance and ATM advance fees may apply. Refer to the applicable credit card account agreement or line of credit account agreement for more details.

[5] Statements at Wells Fargo ATMs should not be used in place of the account statement for balancing or verifying the actual account balance.

[6] If your debit card or debit card number is used to receive a credit transfer, the frequency and dollar amount of those transfers may be limited by the applicable card network.

## ATM and merchant terminal malfunctions

Generally, we're not responsible for damages resulting from an ATM or merchant terminal malfunction. However, for applicable accounts, see "In case of errors or questions about your electronic fund transfers" in the "Electronic Fund Transfer Services" section of this Agreement.

## Fees for use of card

Other applicable fees for use of your card, and details about certain fee waivers and reimbursements, are described in the Consumer Schedule and Business Schedule.

**We may charge you a fee for each action you take at a non-Wells Fargo ATM**, including withdrawing cash, checking your balance, or transferring funds, which may result in multiple fees. For example, a non-Wells Fargo ATM operator may give you the option to check your balance when withdrawing cash, and if you select that option, we may charge you both a balance inquiry fee and a cash withdrawal fee. **In addition, the non-Wells Fargo ATM operator or network may charge you a fee**, which is included in the total amount withdrawn from your account and applies to your card's daily ATM withdrawal limit. We may waive our fee and/or reimburse the non-Wells Fargo ATM operator's fee, in whole or in part, if allowed by the terms of your account.

We'll charge a fee if you make a teller-assisted cash disbursement at a non-Wells Fargo bank that accepts Visa-branded cards. You may also be charged a fee by other banks and financial institutions for over-the-counter cash disbursements at their branches. That fee may be added to your total disbursement and will apply to your card's daily ATM withdrawal limit. Some merchants may assess a fee when you use your card for a purchase or for cash back. The merchant fee will be included in the total purchase amount and will apply to your card's daily purchase limit.

## Daily limits

Unless otherwise specified, a "day" is defined as the 24-hour period from midnight to midnight, Pacific Time. Transactions made in other time zones will be based on when received in Pacific Time. You may use your card subject to your daily purchase limit, daily ATM withdrawal limit, and the available balance in your account. The following rules apply:

**Limits on dollar amounts:** Your card's daily purchase limit is the maximum U.S. dollar amount of purchases (including cash back, if any) that can be authorized each day from your primary linked account, less merchant fees, if any. Note: If you use your card or card number to fund a digital wallet, brokerage, or other type of account, these Account Funding Transactions (AFTs) will count against your card's daily purchase limit. AFTs may also be limited by the applicable card network. If your daily purchase limit is more than $99,999, you may ask that the merchant process multiple transactions to complete a purchase above this amount.

Your card's daily ATM withdrawal limit is the maximum amount of cash you can withdraw each day from any combination of accessible accounts using your card, less any fees charged by the non-Wells Fargo ATM operator or third party, if applicable. When you use a Wells Fargo ATM in Assisted-Service mode, your card's daily ATM withdrawal limit may not apply.

You can confirm your card's daily limits through online banking, our mobile app, or by calling us.

**Limits for your card:** We provide you your daily ATM withdrawal and purchase limits when you receive your card, unless otherwise stated in the Agreement. **Note:** For security reasons there may be additional limits on the amount, number, or type of transactions you can make using your card.

There's generally no limit on the number of times the card may be used each day as long as the applicable daily ATM withdrawal limit and daily purchase limit are not exceeded, and there's a sufficient available balance in accounts you access for the transactions. If an ATM transaction or purchase would create an overdraft on the account, we may, in our sole discretion, take any of the actions described in the "Available Balance, Posting Transactions, and Overdraft" section of this Agreement.

When we approve a transaction or purchase, we call that an authorization.

We may limit the number of authorizations we allow during a period of time (for example, if we notice out-of-pattern use of your card, or suspected fraudulent or unlawful activity). For security reasons, we cannot explain the details of the authorization system. If we don't authorize the payment, we may notify the person who attempted the payment that it has been refused. We won't be responsible for failing to give an authorization. In our discretion, we may allow or deny transactions or authorizations from merchants who are apparently engaged in or who are identified as engaged in the internet gambling business.

**Changes to your card limits:** We may, without telling you, increase your daily purchase or ATM withdrawal limit based on account history, activity, and other factors. If we decrease the limits of your card, we'll notify you in accordance with applicable law.

## Using your card through a mobile device

A mobile device means a smartphone, tablet, or any other hand-held or wearable communication device that allows you to electronically store or electronically present your debit card or debit card number (digital card number) to make debit card transactions.

When you use your debit card with your mobile device for transactions:

- Availability may be affected by your mobile carrier's coverage area, and your mobile carrier may charge you message and data rates, or other fees.
- Your debit card information is sent across wireless and computer networks.
- Information about your mobile device may be transmitted to us.
- You should secure the mobile device the same as you would cash, credit cards, and other valuable information. Password protect and lock it to help prevent unauthorized transactions and notify us promptly if it's lost or stolen.
- When you make a purchase or payment using your mobile device, the merchant won't provide an option for cash back.
- A physical card may be required for access to Wells Fargo ATMs within secure locations.
- You can access Wells Fargo ATMs by holding your mobile device close to the Contactless Symbol displayed on the ATM.

- Each time you access a Wells Fargo ATM with your mobile device and card PIN, you can perform one monetary transaction (such as a cash withdrawal), or one non-monetary transaction (such as a balance inquiry) before your one monetary transaction.
- If you're accessing a Wells Fargo ATM in Assisted-Service mode using your mobile device, your card's daily ATM withdrawal limit will apply and you won't be able to access accounts that are not linked to your card.
- We may automatically provide third-party digital wallet operators with updated digital card number information, such as when your card is replaced or reissued.
- In certain circumstances (such as when you set up recurring payments to a subscription service), another unique identifier may be generated from your digital card number to be used for card transactions.

Third parties, such as merchants, card association networks, mobile carriers, digital wallet operators, mobile device manufacturers, and software application providers may 1) use and receive your digital card number, and information about your card transactions as necessary to effect, administer, or enforce the card transaction, and 2) receive information about your mobile device. The third-party digital wallet operator may use this information to display it to you or for its own purposes according to the terms, conditions, and other agreements that the digital wallet operator may require you to accept. Please refer to the third-party digital wallet operator's privacy policy and terms and conditions for more detail about how the digital wallet operator will use and retain your information. We are not responsible for a third party's privacy practices or level of security.

We may, at any time, partially or fully restrict your ability to make debit card transactions through a mobile device. If you want to remove your digital card number from your mobile device, contact us using the information listed in the "Questions? We're here for you" section at the beginning of this Agreement.

## Card on file with merchants

If you give your debit card number to a merchant with authorization to bill that card for recurring payments, or to keep it on file for future purchases or payments, the merchant may receive updated card information to process such payments. However, since not all merchants receive updated card information, we recommend you notify each merchant of your new debit card number and/or expiration date to ensure your payments continue uninterrupted. If you have a card on file with a merchant and want to cancel the payment arrangement, be sure to cancel it directly with the merchant.

## Authorization holds for card transactions

For all card purchase transactions, we may place a temporary hold on some or all of the funds in the account linked to your card when we obtain an authorization request. **We refer to this temporary hold as an authorization hold. The funds subject to the hold will be subtracted from your available balance.** We generally release the hold within 3 business days, but it can be up to 30 business days for certain types of debit card transactions, such as international car rental and hotel, from the time of authorization or until the transaction is paid from your account.

If the merchant does not submit the transaction for payment within the time allowed, we'll release the authorization hold. This means your available balance will increase until the transaction is submitted for payment by the merchant and posted to your account. If this happens, we must honor the prior authorization and will pay the transaction from your account. In some situations, the amount of the hold may differ from the actual transaction amount since the merchant may not know the total amount you'll spend. For example: A restaurant submits the authorization request for your meal before you add a tip.

**You might end up overdrawing your account even though the available balance appears to show there are sufficient funds to cover your transaction.** For example: A merchant does not submit a one-time debit card transaction for payment within three business days of authorization (or up to 30 business days); we must release the authorization hold even though we'll have to honor the transaction. When we receive it for payment, it's paid from the funds in the account and at that time it causes an overdraft.

You should record and track all of your transactions closely to confirm your available balance accurately reflects how you spend funds from the account linked to your card.

## Partial authorization for card transactions

If a debit card or ATM card purchase amount exceeds the current available balance in the primary linked account when you're making a purchase, you may be able to use your available balance to pay for a portion of the total purchase. The transaction will be subject to a partial authorization daily purchase limit set by the Bank and your card's daily purchase limit.

We'll first try to approve the full amount of the purchase with the available funds in your checking account, account(s) linked for Overdraft Protection, and, if enrolled, using Debit Card Overdraft Service. If we don't approve the full amount of the purchase, we may approve a portion of the purchase using the remaining available funds in your checking account. This is called a partial authorization. The remaining amount of the purchase total would need to be covered by another form of payment, such as cash or another card. If you're unable/unwilling to provide an additional form of payment, and the transaction does not occur, the partial authorization will be reversed by the merchant. Not all merchants are able to accept partial authorizations or process transactions using multiple forms of payment.

**Transactions outside the United States**

If a card is used to make an ATM withdrawal or a purchase outside the United States, the network handling the transaction will convert the local currency amount of the transaction to U.S. dollars (or, in the case of a purchase only, the merchant handling the transaction may convert the currency). If the network converts the currency, it will use either a rate selected by the network from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate the network itself receives, or the government-mandated rate in effect for the applicable central processing date. If the merchant handling the purchase converts the currency, the merchant will determine the currency conversion rate. For each purchase transaction completed outside the United States, we may also charge an international purchase transaction fee, which we base on the amount provided to us by the network (for example, Visa, MasterCard) in U.S. dollars.

**Ending your card use**

Your card is our property.

We may cancel or suspend your card or card banking access at any time without notice to you, and we may decide not to issue a card to you or replace your card. You may cancel your card or card banking access at any time by calling the number on the back of your card. If the card is canceled, you must pay for any card transactions made before the card is canceled, and you will immediately destroy the card after it is canceled. For the Wells Fargo Campus Card℠ program, school issued campus cards are the property of the school.

**Zero Liability protection**

With Zero Liability protection, you'll have no liability for card transactions that you did not make or authorize, subject to certain conditions and so long as those transactions occurred before the end of the 60-day period described hereafter.

If your account statement shows card transactions that you did not make or authorize, tell us at once. If you don't notify us within 60 days after the statement was mailed or was otherwise made available to you, you'll be liable for any additional unauthorized card transactions that occurred after the 60-day period and before you provided notice to us (if we could have stopped those card transactions had you promptly notified us). This will apply even to unauthorized card transactions that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we'll extend the time period.

**For card transactions from consumer accounts:** Your card comes with Wells Fargo's Zero Liability protection, which provides you with more coverage than what Regulation E requires for cards accessing consumer accounts (see "Liability for unauthorized transactions according to Regulation E" in the "Electronic Fund Transfer Services" section of this Agreement).

**For card transactions from business accounts:** Your card comes with Wells Fargo's Zero Liability protection.

**Additional information for Wells Fargo Campus Card Program customers**

Wells Fargo campus cards are available two ways:
1) Wells Fargo issued cards
2) School issued cards

The Wells Fargo Campus Card Program offers optional banking services to students of participating colleges and universities. These services are also available for faculty and staff at most of our participating schools. Visit wellsfargo.com/debit-card/campus-card/schools for additional details. Campus debit cards can be identified by the Visa® logo on the front of the card; campus ATM cards don't include a Visa logo.

**A Wells Fargo-issued card** is produced by Wells Fargo and delivered to currently enrolled students and currently employed faculty and staff by mail after we receive their request for a campus debit card. A card may be requested by bringing a valid school ID from a participating college or university to a Wells Fargo branch located in the same state as the college or university. The card must be linked to an eligible new or existing deposit account to be used for purchases and ATM transactions, and it expires five years from the date it was issued. After the card expires, we'll issue you a standard Wells Fargo Debit Card. You may visit a Wells Fargo branch to request another campus debit card if you remain eligible based on current enrollment or employment at a participating college or university.

**A school issued card** is produced by a participating college or university and issued to currently enrolled students and currently employed faculty and staff by the school. It can be linked to an eligible new or existing deposit account to be used for purchases and ATM transactions. School issued campus ATM cards can be linked to an eligible deposit account at any time for up to five years from the date it was issued, and it expires five years after it is linked to an eligible deposit account. After the card expires, you can contact Wells Fargo and request a standard Wells Fargo Debit or ATM Card to use for purchases and ATM transactions. Or, you can request another campus ATM card from the school if you remain eligible based on current enrollment or employment at a participating college or university, and then visit a Wells Fargo branch to link your campus ATM card to your eligible deposit account.

Both Wells Fargo and school issued campus cards are subject to daily ATM withdrawal limits and daily purchase limits. For a new campus debit card, we provide your daily ATM withdrawal and purchase limits when you receive your card. For a new campus ATM card, the limits below apply to your card, unless you request and are provided other limits at the time you link your campus ATM card to an eligible deposit account. Replacement campus debit or campus ATM cards will have the same limits as the card it replaced at the time the replacement card is issued. You can confirm your limits by calling us at the number listed in the "Questions? We're here for you" section at the beginning of this Agreement, or by viewing them in online banking.

| New campus ATM card daily limits | |
| --- | --- |
| ATM Withdrawals | $1,010 |
| Purchases | $5,000 |

To view the Terms and Conditions for Wells Fargo Campus Debit and ATM Cards, visit wellsfargo.com/debitcardterms (English) or wellsfargo.com/spanishdebitcardterms (Spanish).

**Card and ATM safety tips**

**Card safety**

- Always protect your card and keep it in a safe place, just like you would cash, credit cards, or checks.
- Create a PIN that does not include any number or word that appears in your wallet (such as birth date, name, or address). Note: Most ATMs outside of the U.S require a four-digit numeric PIN.
- Memorize your PIN, never tell it to anyone, and never write it down.
- Change your PIN every six months. If you have forgotten your PIN or want a new one, visit your nearest Wells Fargo location.
- Shop with merchants you know and trust.
- Look at your account statements when you receive them to be sure you made the transactions listed. Contact us immediately if you identify anything suspicious.
- Make sure your internet transactions are secure. Look for secure transaction symbols.
- Log off from any site after you make a purchase. If you cannot log off, shut down your browser to keep someone from accessing your information.
- Avoid sending your card number through email because it isn't secure, and don't give the number over the phone unless you made the call.
- If your card is ever lost or stolen, immediately notify us at the number or P.O. Box listed in the "Questions? We're here for you" section at the beginning of this Agreement.
- Destroy your old card if you receive a replacement.
- Before using an attended or unattended merchant terminal, look at it for possible tampering or for the presence of any unauthorized attachment that could capture your card information or PIN.

**ATM safety**

- Be aware of your surroundings and be cautious when you withdraw money.
- Watch for suspicious persons or activity around the ATM. If you notice anything out of the ordinary, come back later or use an ATM elsewhere. If you see someone suspicious or unusual circumstances, don't use the ATM at that time. If you're in the middle of a transaction, cancel the transaction, take your card and leave the area and come back at another time or use an ATM at another location.
- Before using the ATM, look at it for possible tampering or for presence of any unauthorized attachment that could capture your card information or PIN.
- Report all crimes immediately to the operator of the ATM or local law enforcement.
- Consider having someone accompany you when using an ATM after dark.
- Be sure no one sees you enter your PIN.
- Avoid showing your cash. Put it away as soon as your transaction is completed. Wait to count your cash until you're in the safety of a locked enclosure, such as a car or home.
- Keep safe or securely get rid of your ATM receipts.
- Keep your engine running when you use a drive-up ATM. Keep your doors locked and your passenger window up.

# Fund Transfer Disclosures — General

The following provisions are in addition to, and not in place of, any other agreements you have with us regarding funds transfers to and from your account. The terms "funds transfer," "funds transfer system," "payment order," and "beneficiary" are used here as defined in Article 4A of the Uniform Commercial Code - Funds Transfers, as adopted by the state whose laws govern your account. As used in these provisions, a funds transfer does not include a transaction made using a Wells Fargo issued card. Examples of funds transfers covered by these provisions are ACH transactions, remittance transfers, and wire transfers (whether outgoing or incoming, foreign or domestic). Some consumer transfers referenced in this section may also be electronic fund transfers subject to Regulation E Subpart A as described below. If the transfer is governed by Reg E Subpart A, the provisions of the section of this Agreement titled "Electronic Fund Transfer Services" control in the event of conflict with this section.

**Rules of funds transfer systems**

Funds transfers to or from your account will be governed by the rules of the funds transfer system(s) through which the transfers are made ("system rules"), including Fedwire, the National Automated Clearing House Association, the Electronic Check Clearing House Organization, any regional association (each an ACH), the Clearing House Interbank Payments System (CHIPS), the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") the RTP system ("RTP System"), or other funds transfer system. We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN").

**Sending funds transfers/ Means of transmission**

When acting upon your transfer instructions, we may use any means of transmission, funds transfer system, clearing house, or intermediary bank that we reasonably select.

**Notice of funds transfers**

We'll notify you of funds electronically debited from or credited to your account through the account statement covering the period in which the transaction occurred. We're under no obligation to provide you with any additional notice or receipt.

**Reliance on identification numbers**

If an instruction or order to transfer funds describes the party to receive payment inconsistently by name and account number, we'll rely on the beneficiary account number even if the account number identifies a party different from the named recipient. If an instruction or order to transfer funds describes a participating financial institution inconsistently by name and identification number, the identification number may be relied on as the proper identification of the financial institution.

**Your duty to report unauthorized or erroneous funds transfers**

You'll exercise ordinary care to determine whether a funds transfer to or from your account was either not authorized or erroneous. You will also notify us of the facts within a reasonable time, not exceeding 14 days after (i) you have received your account statement from us on which the funds transfer appears or (ii) you otherwise have notice of the funds transfer, whichever is earlier. If you don't notify us within 14 days, you are precluded from asserting we are not entitled to retain payment for the funds transfer.

**Erroneous payment orders**

You could lose funds if you provide incomplete or inaccurate information in your payment orders. We have no obligation to detect errors you make in payment orders (for example, paying the wrong person or the wrong amount). Just because we detect an error once, we won't be obligated to detect future errors. We'll rely on the beneficiary account number and beneficiary bank identification number (e.g., IBAN, RTN, or SWIFT BIC) you provide with an instruction or order.

**ACH transactions**

These additional terms apply to payments to or from your account that you transmit through an ACH:

- Your rights as to payments to or from your account will be based on the laws governing your account.
- When we credit your account for an ACH payment, the payment is provisional until we receive final settlement through a Federal Reserve Bank or otherwise receive payment.
- If we don't receive final settlement or payment, we're entitled to a refund from you for the amount credited to your account.
- Any Originating Depository Financial Institution (ODFI) may initiate, pursuant to ACH Operating Rules, ACH debit entries to your account for presentment or re-presentment of items you write or authorize.

**Remittance transfers**

Remittance transfers are initiated by consumers primarily for personal, family, or household purposes, and are sent outside the United States and its territories. Each time you initiate a remittance transfer, you'll receive disclosures outlining additional rights provided by federal law. You also may obtain a copy of those rights on wellsfargo.com or in any branch.

**Incoming international wire transfers**

Incoming wire transfers received in a foreign currency for payment into your account will be converted into U.S. dollars using the applicable exchange rate without prior notice to you. For more information, see the "Applicable Exchange Rate" section of this account agreement.

**Reversal or return of ACH transactions**

**Consumer accounts only:** You have the right to reverse any unauthorized ACH payment that was debited from your account. If you give us written notice that you want to reverse a payment, we'll credit your account for the amount of the payment. You must notify us no later than 15 days after we send or otherwise make available to you the account statement that reflects the payment you want to reverse. This right of reversal is in addition to your right to stop payment.

**Business accounts only:** Under the ACH Rules, the Bank can return any non-consumer ACH debit entry as unauthorized until midnight of the business day following the business day the Bank posts the entry to your account. In order for the Bank to meet this deadline, you're required to notify us to return any non-consumer ACH debit entry as unauthorized by the cutoff time we separately disclose. The return cutoff time is currently 3:00 p.m. Central Time, of the business day following the business day the Bank posts the ACH debit entry. If you don't notify us in a timely manner of the unauthorized non-consumer ACH debit entry, we won't be able to return it without the cooperation and agreement of the originating bank and the originator of the debit entry. Any other effort to recover the funds must occur solely between you and the originator of the entry.

**Additional information on ACH debit entries**

If you provide information that is incorrect or subject to change (for example, if the sender changes its company identification number or individual identification number), it may result in payment of the ACH debit entry. You acknowledge this risk and agree that you're responsible for notifying the sender of the ACH debit entry that your authorization has been revoked. You agree to indemnify and hold us harmless from, and against any loss we incur, as a result of our paying an ACH debit entry, if any of the information relied on in the stop payment order is incorrect or incomplete (or as a result of our not paying an ACH debit entry for which a valid stop payment order is in effect).

**Liability for transactions not covered by Regulation E**

For purchases and other transactions in consumer accounts not governed by Regulation E, you're liable for all losses relating to unauthorized funds transfers that don't result solely from our negligence or intentional misconduct, unless the laws governing your account require lesser liability.

**Receiving instant payments**

The following additional terms apply to any instant payments we receive for credit to your account through an instant payments network, which may be the RTP® network operated by a third party, The Clearing House, or another third party network. The terms "sender," "receiver," and "sending participant" are used here as defined in the system rules governing the RTP network. In addition to the rules of the instant payments network, instant payments will be governed by the laws of the state of New York, including New York's version of Article 4A of the Uniform Commercial Code, as applicable, without regard to its conflict of laws principles.

- Instant payments networks may be used only for eligible payments between a sender and receiver whose accounts are located in the United States. You may not send or receive instant payments on behalf of any person or entity not domiciled in the United States. Instant payments that are permitted under the rules of the instant payments network and our requirements are considered eligible payments for purposes of this Agreement.
- Instant payments cannot be cancelled or amended by the sender. If we receive a message from a sending participant requesting return of an instant payment received for credit to your account, we may notify you of that request. You're not obligated to comply with any such request for return of funds. Any dispute between you and the sender of an instant payment should be resolved between you and the sender.
- If you don't wish to accept an instant payment credit received to your account, you may request that we return such payment to the sender. We may, at our sole discretion, attempt to honor such request but will have no liability for our failure to do so.
- Instant payments are typically completed within thirty (30) seconds of transmission of the instant payment by the sender, unless the instant payment fails or is delayed due to a review by us or the sending participant, such as for fraud, regulatory, or compliance purposes. Transaction limits imposed by the instant payments network or sending participant may also prevent instant payments from being sent to your account.

We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN").

**Funds Transfer Security Procedure**

You agree that we will follow a commercially reasonable security procedure of our choice to verify the authenticity of an instruction we receive to send a funds transfer from your account. The security procedure may vary depending on whether we receive the instruction in person, in writing, by phone, or via online or mobile. If we offer, but you decline, an optional security procedure that is commercially reasonable, then you agree that the security procedure chosen to verify the payment order is commercially reasonable for your transaction. You agree to be bound by any funds transfer request that Wells Fargo receives and verifies following a commercially reasonable security procedure, even if the payment order was not authorized by you. More details about the security procedures may be found in the applicable funds transfer agreement.

**Consumer accounts only:** This provision applies to fund transfers governed by Article 4A of the Uniform Commercial Code and not electronic fund transfers governed by Regulation E, Subpart A. For more information about your rights and responsibilities related to electronic fund transfers as defined by Regulation E, please see the section of this Agreement titled "Electronic Fund Transfer Services."

**Rejecting a Funds Transfer Request**

We may reject a funds transfer request without any liability to you. Some examples may include, if you don't have enough available funds in your account for the funds transfer and applicable fees, if we are unable to verify a payment order or person requesting the funds transfer, or if we are unable to complete the request for any other reason. We will notify you if we decide to reject the request.

# Electronic Fund Transfer Services

**(Consumer accounts only)**

**General rules for electronic fund transfer services**

When you read this section, you'll see references to Regulation E which provides certain protections and responsibilities.

The following provisions apply to electronic fund transfers to or from your consumer deposit account that are governed by Subpart A of Regulation E.

**Note:** These provisions don't apply to wire transfers or remittance transfers (e.g., ExpressSend® and consumer-initiated international wire transfers). Remittance transfers you send through us are governed by a separate agreement you enter into when you sign up for the service or send the remittance transfer. Refer to the "Funds Transfer Disclosures — General" section of this Agreement.

We offer a variety of electronic fund transfer services you can use to access funds in your account(s) and perform other transactions detailed in this section. We describe some of these services in this section and also provide certain disclosures that apply to the use of electronic fund transfer services with your consumer account. Some of these services are governed by separate agreements we give to you at the time your card is mailed or you sign up for the service (e.g., ATM and debit cards, online, and mobile banking).

When you read this section, you'll see references to Regulation E or Reg E. This regulation applies to transactions you can perform using your card to access your account, such as purchases and ATM transactions. Regulation E also applies to other types of electronic fund transfers you can make from or to your account, such as payments made using Bill Pay and the direct deposit of your paycheck into your account. Regulation E sets forth the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfers and of the banks or other persons who offer these services. It includes the actions you need to take if you believe your card, your card number, your PIN, or other access device has been lost or stolen, or if you notice an error or unauthorized electronic fund transfer on your account and the rules regarding your potential liability for these transfers. Your responsibilities and protections under Regulation E are described in more detail below.

For unauthorized card transactions, in addition to the rights you have under Regulation E, Wells Fargo Zero Liability protection provides you with added protection from liability. For details, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

The following table summarizes the types of transactions to which Regulation E applies and tells you if Zero Liability protection covers the transaction.

| Electronic fund transfer | Description | Transaction covered by Reg E | Zero Liability protection |
|---|---|---|---|
| **Card transactions** | | | |
| **Debit and ATM cards** | Use your Debit or ATM card to make purchases, withdrawals, payments, transfers, and other transactions as described above in the "Debit Cards and ATM Cards" section of this Agreement. | X | X |
| **Electronic transfers, payments, credits, and electronic check conversions** | | | |
| **Transfers** | Send or receive transfers between your accounts or to other recipients at Wells Fargo or other financial institutions | X | |
| **Payments** | One-time or recurring payments from your account that you initiate or preauthorize for withdrawal from your account | X | |
| **Credits** | Manual or automatic electronic deposits to your account, such as payroll or benefits payments | X | |
| **Electronic check conversions** | Electronic fund transfer using information from a check (e.g., the Bank's routing number and your account number) | X | |
| **Phone Bank transactions** | | | |
| **Phone Bank transactions** | **Not under a written agreement or plan:** A request to the Phone Bank to make a transaction to or from your account | | |
| | **Under a written agreement or plan:** The Phone Bank, under an agreement, can make transactions to and from your account | X | |

| | |
|---|---|
| **Liability for unauthorized transactions according to Regulation E** | **Tell us AT ONCE if you believe your card, card number, PIN, or other access device has been lost or stolen,** or if you believe that an electronic fund transfer has been made by someone other than you and without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus funds in any line of credit, savings account, or credit card linked to your account or as part of an Overdraft Protection plan). |

If you tell us within two business days after you learn of the loss or theft of your card, card number, PIN, or other access device, you can lose no more than $50 if someone used your credentials without your permission (however, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement).

If you **do NOT** tell us within two business days after you learn of the loss or theft of your card, card number, PIN, or other access device, and we can prove we could have stopped someone from using your credentials without your permission if you had told us, you could lose up to $500 (however, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement).

Also, if your account statement shows transfers that you did not make or authorize, including those made by your card, card number, PIN, other access device, or other means, tell us at once. If you do not notify us within 60 days after the statement was mailed or was otherwise made available to you, you will be liable for any additional unauthorized transactions that occurred after the 60-day period and before you provided notice to us (if we can prove we could have stopped those transactions had you promptly notified us). This will apply even to unauthorized transactions that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we will extend the time periods.

| | |
|---|---|
| **Contact in the event of unauthorized transfer** | If you believe your card, card number, PIN, or other access device, has been lost or stolen, call us at 1-800-869-3557 or the number listed on your statement, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995. |

You should also call the number or write to the address listed above if you believe a transfer has been made by someone other than you and without your permission.

| | |
|---|---|
| **Preauthorized credits to your account** | If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can check your online or mobile banking, enroll in account alerts, or call us at 1-800-869-3557 to find out whether or not the deposit has been made. |

| | |
|---|---|
| **Handling preauthorized payments** | **Right to stop payment:** If you have told us in advance to make regular (recurring) payments out of your account, you can stop any of these payments. Here's how: Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995, in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. There is no fee to stop a recurring preauthorized payment using the debit card. |

**Notice of varying amounts:** If the amount of these regular (recurring) payments vary, the party you are going to pay should tell you, 10 days before each payment, when it will be made and how much it will be. (The party you are going to pay may allow you to choose to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

**Liability for failure to stop payment:** If you order us to stop one of these payments three business days or more before the transfer is scheduled, and we do not do so, we will pay for your losses or damages.

**Note:** We cannot stop payment on a purchase transaction unless it is a preauthorized electronic fund transfer.

**Electronic check conversion**

You may authorize a merchant or other payee to make a one-time electronic payment from your account using information from your check to 1) pay for purchases, or 2) pay bills.

**Account inquiry**

You have the right to contact us to find out whether an electronic transfer has been credited or debited to your account. Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR 97228-6995.

**Receipts**

You can get a receipt at the time you make any transfer to or from your account using one of our ATMs or when you use your card at a merchant terminal.

**Our liability for failure to make transfers**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. For instance, we will not be liable if:

- Through no fault of ours, you do not have enough money in your account to make the transfer,
- The transfer would go over the credit limit on a credit account linked for Overdraft Protection,
- The ATM where you are making the transfer does not have enough cash,
- The terminal or system was not working properly and you knew about the breakdown when you started the transfer,
- Circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions we have taken, or
- There is some other exception stated in our Agreement with you.

**In case of errors or questions about your electronic fund transfers**

If you see an error or have questions about your electronic transfers, think your deposit statement or receipt is wrong, or you need more information about a transfer listed on an account statement or receipt, call us at 1-800-869-3557 or the number listed on your account statement, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995 as soon as you can. We must hear from you no later than 60 days after we send the FIRST account statement on which the problem or error appeared, and you should take the following actions:

- Tell us your name and account number (if any) and the dollar amount of the suspected error.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error, or why you need more information.

If you tell us in person or by phone, we may require that you send us your complaint or question in writing within 10 business days.

**Investigations**

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we need more time, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale transactions, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

# Other Account Services and Restrictions

**Telephone banking services**

You may use our automated phone system to get account information, transfer funds between Wells Fargo accounts, or pay certain Wells Fargo credit bills. To access this service, you must have a valid PIN, either for your debit or ATM card, or a cardless PIN issued only for authentication purposes. If you don't have a valid PIN, we'll ask you for information to verify your identity. We may cancel your cardless PIN at any time without notice, including after six months of non-use. We may comply with any request of a caller using Wells Fargo's telephone banking services, provided we authenticate the caller in compliance with one of the identity verification procedures described in this paragraph.

**Large cash withdrawals or deposits**

We may place reasonable restrictions on large cash withdrawals. These restrictions may include requiring you to provide reasonable advance notice to ensure we have sufficient cash on hand. We don't have any obligation to provide security if you make a large cash withdrawal. If you want to deposit a large amount of cash, we may require you to provide adequate security or exercise other options to mitigate possible risks.

**Checks with multiple signatures**

We may act on the instructions of any one authorized signer on your account and not require multiple signatures. If you have indicated that more than one signature is required to transact on your account, you acknowledge and agree that such requirements are for your own control purposes only, and we won't be liable if a check or other transaction is processed without multiple signatures. We're not responsible for reviewing your checks or other transactions for multiple signatures.

**Checks with dates and special instructions**

We may pay the amount encoded on your check in U.S. dollars, even if you wrote the check in a foreign currency or made a notation on the check's face to pay it in a foreign currency. If we, in our sole discretion, pay a check or other item in a foreign currency, the applicable exchange rate may apply. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Statements, Interest, and Other Account Information" section of this Agreement. The encoded amount is in the line along the bottom edge of the front of the check where the account number is printed.

We may, without inquiry or liability, pay a check even if it:

- Has special written instructions indicating we should refuse payment (e.g., "void after 30 days" or "void over $100"),
- Is stale-dated (i.e., the check's date is more than six months in the past), even if we're aware of the check's date,
- Is post-dated (i.e., the check's date is in the future), or
- Isn't dated.

**Use of a facsimile or mechanical signature**

If you use any device or machine to provide a faxed, electronic, computer generated or other mechanical signature (including a stamp on a check) it will be treated as if you had actually signed it.

**ACH debit entries**
(Business accounts make note)

Under the ACH operating rules, certain types of ACH debit entries may only be presented on a consumer account. We'll have no obligation to pay, and no liability for paying, any consumer ACH debit entry on a business account.

**Acceptable form for checks**

Your checks must meet our standards, including paper stock and dimensions; we may refuse checks that don't or that cannot be processed by our equipment. Checks must include our name and address as provided by us. Certain check features, such as security features, may impair the quality of a check image. We're not responsible for losses that result from your failure to follow our check standards.

**Checks presented by a non-customer**

For these transactions, we require acceptable identification, which may include a fingerprint from the person presenting your check. We may not honor the check if the person refuses to provide us with requested identification. We may charge a fee for non-customers to cash a check.

**Electronic check indemnifications**

An "electronic check" and an "electronic returned check" means an electronic image of a paper check or paper returned check or the electronic information derived from it.

When we transfer or present an electronic check or electronic returned check, we provide the following warranties:

- **Image Quality Warranty.** We guarantee that the electronic image accurately represents all of the information on the front of the check as of the time that the original check is truncated, and the electronic information includes an accurate record of all MICR line information required for a substitute check and the amount of a check.
- **No Double Debit Warranty.** We guarantee that the warrantee won't receive a presentment of or otherwise be charged for an electronic check, an electronic returned check, the original check, a substitute check, or a paper or electronic representation of a paper substitute check, in a way that the warrantee will be asked to pay a check that it has already paid.

When we transfer an electronic check for collection or payment, we make the image quality warranty and the no double debit warranty to the transferee bank, any subsequent collecting bank, the paying bank, and the drawer. When we transfer an electronic returned check for return, we make the image quality warranty and the no double debit warranty to the transferee returning bank, the depository bank, and the owner.

**Indemnities applicable to electronic checks and electronic returned checks.** You will indemnify, defend, and hold us harmless from all liabilities, obligations, demands, and costs (including fees of legal counsel and accountants) awarded against or incurred by us (collectively, "losses and liabilities"), related to the transfer or return of an electronic check or an electronic returned check on your behalf. If we suffer any losses or liabilities related to a breach of the image quality warranty or the no double debit warranty, you will reimburse us and not hold us responsible or liable.

**Indemnities applicable to remote deposit capture services (including Wells Fargo Mobile Deposit)**. If a depository bank accepts the original check from which an electronic check is created and suffers losses due to the check having already been paid, we're required to indemnify and reimburse that bank. If we suffer any losses or liabilities related to that type of depository bank indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

**Indemnities applicable to electronically created items.** If we transfer or present an "electronically created item" and receive settlement or other consideration for it, we're required to indemnify and reimburse each transferee bank, any subsequent collecting bank, the paying bank, and any subsequent returning bank against losses that result from the fact that:

- The electronic image or electronic information is not derived from a paper check,
- The person on whose account the electronically created item is drawn didn't authorize its issuance or the payee stated on the item, or
- A person receives a transfer, presentment, or return of, or otherwise is charged for an electronically created item in such a way that the person is asked to make payment based on an item it has paid.

If we suffer any losses or liabilities related to that type of electronically created item indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

## Stop payment

Applicable fees are described in the Consumer Schedule and Business Schedule.

**Requesting stop payment on a check**
You may request a stop payment on a check if you allow us a reasonable amount of time to act on it; the same is true if you ask us to cancel a stop payment order. You can request a stop payment through wellsfargo.com, by phone, or by visiting your local branch. We may verify that we have not already become obligated to pay the check from your account and can verify after we accept your stop payment order.

To issue a stop payment order on a check, we need the following information:

- Your bank account number
- The check number or range of numbers
- The check amount or amounts
- The payee(s) name(s)
- The date on the check

We are not responsible for stopping payment on a check if you provide incorrect or incomplete information about the check.

**Effective period for a stop payment order**
- **A stop payment order on a check is valid for six months.** We may pay a check once a stop payment order expires. You must request a new stop payment order if you don't want it to expire and we treat each renewal as a new order, and a new fee will apply.
- **Your responsibility after we accept a stop payment on a check.** Even if we return a check unpaid due to a stop payment order, you may still be liable to the holder of the check (e.g., a check cashing business).

**Stop payment orders on ACH debit entries**
You may request a stop payment order for an ACH debit entry that has not already been paid from your account. To be effective, a stop payment order must be received in a time and manner that gives the Bank a reasonable opportunity to act on the applicable ACH debit entry. If you provide verbal instructions, we may require confirmation in writing. If such written confirmation isn't received, we may remove the stop payment order after 14 days. An instruction to revoke a stop payment order must be received in a time and manner that gives us a reasonable opportunity to act on it.

To place a stop payment order on an ACH debit entry, you must provide the following information: (i) your account number, (ii) amount of the ACH debit entry, (iii) effective date, and (iv) payee name. We may request additional information and may, at our sole discretion, use only a portion of the required information in order to identify the ACH debit entry. We may be able to place a stop payment order based on the company identification number of the sender/payee, but this may stop all ACH entries received from this sender/payee.

**Stopping payment on a preauthorized electronic fund transfer**
If your account is a consumer account, you may stop payment on a preauthorized electronic fund transfer. See "Handling preauthorized payments" in the "Electronic Fund Transfer Services" section of this Agreement.

**Post-dated checks**

A post-dated check is a check you issue with a date in the future. We're not responsible for waiting to honor the check unless you issue a stop payment order for the check. You're responsible for notifying us to cancel the stop payment order when you're ready to have that check paid.

**Restricted transactions**

You must not use your account or any relationship you may have with us for any illegal purpose, including "restricted transactions" as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and its implementing regulation, Regulation GG. In our discretion, we may block or otherwise prevent those transactions and, further, we may close the account or end our relationship with you.

# Time Accounts (CDs)

CDs mature and are payable at the expiration of a specified term, which will be no less than seven calendar days after the date of deposit. The CD's maturity date is the last day of the term for the CD and is printed on your receipt.

We may refer to a Time Account as a CD or Certificate of Deposit, even though we don't issue a paper certificate when opening the account or require a paper certificate to close the account.

**You may withdraw funds from your CD on the maturity date without a penalty.** During the seven calendar days after the maturity date, which we refer to as the grace period, you can change the term, generally make withdrawals and additional deposits, or close the CD. No additional deposits to the CD are allowed outside this grace period. You may be charged a penalty if you make a withdrawal at any other time. See "Early withdrawal penalty and Regulation D penalty" in this section.

**Unless you withdraw the funds, your CD will automatically renew at maturity:**

- Typically for the same term unless we inform you at the time of account opening or prior to maturity of a different renewal term, and
- At our standard interest rate in effect on the maturity date for a new CD of the same term and amount, unless we have notified you otherwise.

At renewal, in addition to the interest rate and renewal term, we may change any other CD provision, subject to providing you notice as required by law. Wells Fargo may redeem and close your CD, at our option, if the balance falls below $1.00. This also applies to any CD that you may have within an IRA. We'll treat any interest that is deposited into your CD during the previous term as principal for your new term.

**IRA CDs and ESA CDs**
You may have multiple accounts within your Individual Retirement Account (IRA) or Education Savings Account (ESA) plan. We no longer offer new IRAs or new ESAs. IRA CDs are only available for current IRA customers, and ESA CDs are only available for current ESA customers.

Your IRA/ESA plan balance on December 31 of each year represents the fair market value of your account. We report the fair market value, distributions from and contributions to your IRA/ESA, to the Internal Revenue Service (IRS). If applicable, the IRS may impose penalties. Please consult your tax advisor.

**Interest on your CD**
The Annual Percentage Yield (APY) we disclose to you assumes the interest you earn will remain on deposit until your CD matures. If you withdraw your earned interest before maturity, your account will earn less interest over time and the actual APY will be less than the disclosed APY.

| Term | CD Interest payment options* | | | | |
|------|---------|-----------|------------------|----------|------------|
| | Monthly | Quarterly | Semi-Annually | Annually | At maturity |
| Less than 12 months (365 days) | X | X | X | Not available | X |
| 12 months or more | X | X | X | X | Not available |

*Interest payments for IRA/ESA CDs redeposit monthly into your CD.

With the exception of IRA/ESA CDs, you may choose to have your interest payments re-deposited into your CD, transferred to a Wells Fargo checking or savings account, or paid by check if your CD has a minimum balance of $5,000.

**Early withdrawal penalty and Regulation D penalty**

**Early withdrawal penalty (Fixed Rate CDs and Fixed Rate IRA/ESA CDs):** Other than the Regulation D penalty described below, any money you withdraw from your CD before the end of its term will be subject to an early withdrawal penalty based on the length of the CD term.

| CD Term | Penalty |
|---------|---------|
| less than 90 days (or less than 3 months*) | 1 month's interest |
| 90 through 365 days (or 3-12 months*) | 3 months' interest |
| Over 12 months through 24 months | 6 months' interest |
| Over 24 months | 12 months' interest |

\* Some CD terms are based on days and others are based on months. Check your receipt for the term applicable to your CD.

We calculate the early withdrawal penalty using the amount of principal you withdraw at your CD's interest rate at the time of withdrawal. The penalty is calculated by multiplying the interest rate by the amount of principal withdrawn then dividing that total by 12 to arrive at one month's interest. We'll deduct your early withdrawal penalty from your earned interest. If the penalty is greater than your earned interest, then we'll deduct the difference from the principal amount of your CD.

**Regulation D Penalty**: The Regulation D penalty is seven days' simple interest on the amount withdrawn and applies to the following:

- Withdrawals made within seven days of account opening including the day the account was opened.
- Withdrawals made during the grace period, when additional deposits are made during the grace period and the withdrawal exceeds the amount of the matured CD balance.
- Withdrawals within seven days of any prior withdrawal where the Bank's early withdrawal penalty is not applied.

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate CDs):**

- Death of the CD owner
- Death of the grantor of a revocable family/living trust
- Court determination that a CD owner is legally incompetent

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate IRA/ESA CDs):**

- Death of the IRA CD or ESA CD owner
- Court determination that an IRA CD or ESA CD owner is legally incompetent
- IRA or ESA owner becomes disabled
- IRA owner is age 59 ½ or older
- IRA or ESA owner requests a revocation in writing within seven days of plan opening

# Protecting Your Account and Your Information

**Protection against unauthorized items**

You acknowledge that there's a growing risk of losses resulting from fraud, including unauthorized items. To help prevent fraud on your account, you agree to take reasonable steps to ensure the integrity of your account and items drawn on your account or deposited to it. We recommend you take the following preventive measures (not an exhaustive list):

- Reconcile your account statements when received and promptly notify us of any problem.
- Promptly notify us if you don't receive an expected statement.
- Don't provide your account and routing numbers to unknown persons. Fraudsters may use this information to initiate fraudulent transactions against your account.
- Only write checks to people and businesses whom you know. Fraudsters may try to trick you by pretending to be friends and family, indicating you have won the lottery or sweepstakes, through online dating sites, or impersonating law enforcement.
- Don't deposit checks from people whom you don't know. Fraudsters often request that you deposit a fake check into your account, then request that you return some of the funds. After you return the funds, the check bounces, but you are still responsible to us for the full amount of the check you deposited.
- Write your checks in a manner to prevent others from adding words, numbers or making other changes without your authorization.
- Protect your checks from unauthorized use and theft by securing your supply of checks at all times (for example, never leave checks in an unlocked vehicle, or out in a visible location unattended), using tamper resistant checks, destroying checks you don't intend to use, and not signing blank checks. Check-related fraud is common. If you fail to take any of these preventive measures, we are not responsible for any losses that you may incur.

**Additional protections for business accounts**

**Additional steps business customers should take to help reduce the risk of fraud on their accounts:**

- Assign responsibilities for your business account to multiple individuals and periodically reassign duties. Have different people reconcile statements and withdraw funds.
- Watch for checks cashed out of sequence or made out to cash as flags for embezzlement.
- Review activity for unexpected fluctuations such as the percentage of cash deposits to total deposit size. Most businesses will keep a constant average.
- Notify us immediately when an authorized signer's authority ends so that their name can be removed from account access.
- Obtain insurance coverage for bank account fraud risks.
- Watch out for imposters impersonating vendors or if an alleged vendor changes their payment instructions.
- Only send trusted employees to deliver checks or make deposits.

**Wells Fargo services to help prevent fraud on analyzed business accounts include:**

- Positive pay, positive pay with payee validation, or reverse positive pay
- ACH fraud filter, and
- Payment Authorization service.

In addition, we recommend you use certain industry best practices such as dual custody. With dual custody, when one user initiates an action like a payment or a change in the set-up of a service, the action does not take effect until a second user approves the action using a different computer or mobile device.

**Consequences if a business customer does not implement the fraud prevention services we recommend.** If we have expressly recommended that you use a fraud prevention service or industry best practice and you either (a) decide not to implement or use the recommended service or industry best practice or (b) fail to use it in accordance with the applicable service description or our other applicable documentation, then you are responsible for all losses that could have been prevented or mitigated by correct use of the recommended service or best practice.

**Verifying your identity with your mobile device and your wireless company**

Wells Fargo may collect, use, and retain personal or other information about you or your mobile device to assist in verifying your identity. We may rely on such information provided to us by your wireless company, and you authorize them to disclose:

- Your mobile number, name, address, email;
- Network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI), and other subscriber and device details to Wells Fargo and our service providers for the duration of the account relationship.

Review our Privacy Notice for how we treat your data. You represent that you're the owner of the mobile phone number or have the delegated legal authority to act on behalf of the mobile subscriber to provide this consent.

# Statements, Interest, and Other Account Information

**Statements and notices**

We'll make available to you a statement of your account activity for each statement period, using the postal or email address associated with your account. We'll do the same with notices. If your delivery preference is electronic, we'll notify you by email that your statement or notice is available online. You must be at least 13 years old to receive online statements.

We'll send statements and notices to one owner of a jointly owned account, and you agree that owner is responsible for sharing copies of the information with all other owners. If you request that we send notices to an authorized signer, the authorized signer has the same responsibility. Online statements are available to each joint owner.

Your statement is considered received by you on the second business day after we mail it to you or, if your delivery preference is electronic, when it's available through online banking. You agree to this timing even if the postal or email address you provided us is invalid.

Checking accounts get a monthly account statement. Savings accounts generally get a quarterly account statement, but will get a monthly statement if you set up automatic transfers into your savings account, have electronic fund transfer activity in the account, or have a combined statement for your checking and savings accounts.

**Combined statements**

We may combine statements for accounts with at least one common owner, in which case we consider the first account listed on your statement as your primary account. We'll make available your account statement through the address listed for your primary account. Statements for accounts in a combined statement will be delivered according to the delivery preference of the primary account.

Any person with online access to the primary account will also have online viewing capability to all the information on the combined statement.

If you prefer that we not combine your statements, let us know and we'll keep them separate. This will apply to subsequent statements only, and this option isn't available for Prime Checking and Premier Checking accounts.

**Changing statement period and fee period for checking and non-IRA savings accounts**

We may change the statement period and fee period assigned to your account without advance notice. If your account is interest-bearing, these changes won't affect interest calculations, but they may affect the date we post interest to your account.

For all accounts except analyzed business accounts, if the first new fee period created by our change is fewer than 25 days, the Bank will automatically waive the monthly service fee for that period.

**Check safekeeping and check image service**

**We don't return your physical paid checks in your statements.** Instead, we make copies of your paid checks available online, by calling us, or at our branches.

**For an additional fee, you can enroll in our check image service.** With this service, you'll receive images of your paid checks on your paper statement. See the "Service Fees" section of the Consumer Schedule or Business Schedule for specific applicable fees and additional details. This service isn't available with online statements, savings accounts, or Clear Access Banking.

For checking accounts with paper statements, the fee for this service is posted to your account on the last day of the fee period, and it will only be assessed when check images are included in your statement. If you have a combined statement, only the primary checking account is eligible for the monthly check image service.

When we provide a statement, we have made the check image available to you, even if we don't send originals or images with the statement. We'll destroy original checks after a reasonable period of time we determine. If for any reason we can't provide a copy of your check, we won't be liable for more than the face amount of the check. We cannot provide originals or images of checks that are sent to us as electronic transfers. Additionally, other banks may send us electronic images instead of original checks. In that case, we may provide a copy of the image, but not the original check.

**Account statements or notices returned or undeliverable**

Your account statements or notices will be considered unclaimed or undeliverable if
- Two or more account statements or notices are returned to us through the mail because of an incorrect address; or
- We notify you electronically that your account statement is available for online viewing, and we receive email notifications that our message is undeliverable.

In either event, we may
- Discontinue sending account statements and notices, and
- Destroy account statements and notices returned to us as undeliverable.

We won't attempt to re-deliver account statements and notices to you until you provide us with a valid postal or electronic address.

**Change of address**

You agree to promptly notify us of any change to your postal or email address. We'll change your postal or email address within a reasonable time after you request it. If you have a combined statement, any owner of the primary account can change the address of all accounts included in the combined statement. Unless you instruct otherwise, we may change the postal or electronic address only for the account(s) you specify or for all or some of your other account(s) with us.

We may update your address in our records without a request from you if (1) we identify a need to rely on another address you have provided us; or (2) we receive an address change notice from the U.S. Postal Service or information from another party in the business of providing correct address details that does not match the address in our records for your account or card.

**Your responsibility to review account statements and notices and notify us of errors**

You are obligated to:
- Examine your account statement promptly and carefully.
- Notify us promptly of any errors.
- Notify us within 30 days after we have made your account statement available to you of any unauthorized transaction on your account. Note: If the same person has made two or more unauthorized transactions and you fail to notify us of the first one within this 30-day period, we won't be responsible for unauthorized transactions made by the same wrongdoer.
- Notify us within six months after we have made your account statement available to you if you identify any unauthorized, missing, or altered endorsements on your items.

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** Electronic fund transfers are subject to different time periods for notification of errors, as described in the "Electronic Fund Transfer Services" section of this Agreement. Common examples of electronic fund transfers are ATM, debit card, and Bill Pay transactions.

**Responsibility to notify us of errors**

If you fail to notify us of any unauthorized transaction, error, or claim for a credit or refund within the time frames specified above, your account statement will be considered correct and we won't be responsible for any unauthorized transaction, error, or claim for transactions included in the applicable statement.

**Unauthorized transactions**

A transaction is an unauthorized transaction when it's
- Missing a required signature or other evidence showing you have authorized it, or
- Altered (for example, the amount of a check or the payee's name is changed).

You can notify us of errors on your account statements by promptly
- Calling the telephone number listed on your account statement or in a notice, or
- Submitting a written report (if instructed by us) as soon as possible, but in any event within the specified time frames.

**Actions we take when you report an unauthorized transaction:** We investigate any reports of unauthorized activity on your account. After you submit a claim, we may require you to:
- Complete and return the claim form and any other documents we require,
- Notify law enforcement, and
- Cooperate fully with us in our investigation.

We can reverse any credit made to your account resulting from a claim of unauthorized transaction or error if you don't cooperate fully with us in our investigation or recovery efforts, or we determine the transaction was authorized.

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** For specific information on unauthorized electronic fund transfers, see the "Electronic Fund Transfer Services" section of this Agreement.

## Adverse claims against your account

An adverse claim occurs when
- Any person or entity makes a claim against your account or funds in your account,
- We believe a conflict exists between or among your account's owners, or
- We believe a dispute exists over who has account ownership or authority to withdraw funds from your account.

In these situations, we may take any of the following actions without any responsibility or liability to you:
- Continue to rely on the documents we have on file for your account.
- Honor the claim against your account funds if we're satisfied the claim is valid.
- Freeze all or a part of the funds in your account until we believe the dispute is resolved to our satisfaction.
- Close your account and send a check or other item for the available balance in your account payable to you or to you and each person or entity who claimed the funds.
- Pay the funds into an appropriate court and/or petition the court to resolve the dispute.

We also may charge any account you keep with us for our fees and expenses in taking these actions (including attorney's fees and expenses, and court costs).

## If you carry special insurance for employee fraud/embezzlement
(Business accounts only)

If you have special insurance for employee fraud/embezzlement, we may require you to file your claim with your insurance company before making any claim against us. In such event, we'll consider your claim only after we have reviewed your insurance company's decision, and our liability to you, if any, will be reduced by the amount your insurance company pays you.

## Restricting access to your account

If we suspect any suspicious, irregular, fraudulent, unauthorized or unlawful activities ("Questionable Activities"), we can prevent, delay or decline transactions, freeze all or some of the funds in any account with us that you keep or control, and otherwise restrict access to your account.

- If a state or federal agency requests us to restrict funds in your accounts, we will comply with their request as permitted under state or federal law, and notify you, unless otherwise prohibited by applicable law.
- If we suspect an owner is a victim of elder or vulnerable adult exploitation, we may file a report with the appropriate investigative agency, under applicable state law. We will notify all owners and authorized signers on your account about any Questionable Activities, and our actions, unless otherwise prohibited by applicable law. With your consent, or if permitted by applicable law, we may also notify certain non-account owners about the events that have created our concerns about the Questionable Activities.

We may continue to delay transactions or freeze funds for Questionable Activities until the earlier of when (i) our concerns about the Questionable Activities are resolved to our satisfaction, (ii) the time frame set forth in applicable law, or (iii) we receive a Court order that provides us direction. Unless otherwise required by applicable law to take any of the above actions, we may take these actions in our sole discretion and without liability to you.

## Converting accounts

We can convert your account to another type of deposit account (by giving you any required notice) if:
- You use it inappropriately or fail to meet or maintain the account's requirements, including minimum balance requirements, or
- We determine an account is inappropriate for you based on your use, or
- We stop offering the type of account you have.

## Terminating or suspending services

We can terminate or suspend specific services (for example, wire transfers) without closing your account and without prior notice to you. You can discontinue using a service at any time.

## Obtaining credit reports or other reports about you

We can obtain a credit or other report about you and/or your co-owners and authorized signers to help us determine whether to open or keep an account. We can also obtain information from motor vehicle departments, other state agencies, and public records.

**Sharing information about your account with others**

Generally, if we don't have your consent, we won't share information about your account. However, we may share information about your account in accordance with our separately provided Privacy Notice.

**Use of funds in customers' non-interest-bearing accounts**

We may benefit from having the use of funds in customers' non-interest-bearing accounts. We may use these funds to reduce our borrowing from other sources, such as the Fed Funds market, or invest them in short-term investments, such as our Federal Reserve Account. Our use of funds as described in this paragraph has no effect or impact on your use of and access to funds in your account.

**Interest-bearing accounts**

**Calculating the applicable interest rate:** When you open an interest-bearing account, we provide a rate sheet listing the current interest rate and Annual Percentage Yield (APY) for your account. Interest-bearing accounts earn interest at a variable rate, except CDs. The interest rate may be as low as 0.00%, and we may change the interest rate for variable-rate accounts at any time. The interest rate may vary depending on your daily balances (tiered-rate account). We may pay the same interest rate on more than one tier. The tiers and corresponding interest rates are disclosed in the rate sheet.

We calculate interest using the daily collected balance method, applying a daily periodic rate to the collected balance in your account each day. Interest is calculated using a 365-day year, unless otherwise noted for business accounts in the Business Schedule. Interest compounds daily. For interest-bearing checking and savings accounts, it will be credited monthly.

Cash deposits begin accruing interest the same business day the deposit is credited to your account. If you deposit an item such as a check, interest begins accruing on the business day we receive credit for the item. For time accounts, interest begins to accrue on the business day you deposit non-cash items, such as checks.

**Annual Percentage Yield (APY) and Annual Percentage Yield Earned (APYE):** The Annual Percentage Yield (APY) is a percentage rate reflecting the total amount of interest paid on an account based on the interest rate and the frequency of compounding for a 365-day period. The Annual Percentage Yield Earned (APYE) is an annualized rate that reflects the relationship between the amount of interest actually earned on your account during the statement period and the average daily balance in the account for the statement period.

We calculate both your APY and APYE according to formulas established by federal regulations. The APYE appears on your account statement.

**The right to require notice of withdrawal from your savings account**: We may require seven days written notice before you withdraw money from your savings account.

**Tax identification number certification requirements**

U.S. Treasury regulations require us to determine the tax residency of all customers and payees who could receive income that is reportable to the IRS. We accomplish this by obtaining a Form W-9 from all U.S. taxpayers and a type of Form W-8 from all foreign customers.

- We use Form W-9 to document U.S. tax residency and obtain a Taxpayer Identification Number ("TIN") from the primary owner of each account. Until we have received the Form W-9 and TIN, we're required to apply backup withholding to any income earned.
- Foreign individuals (also referred to as nonresident aliens) and foreign entities document their tax residency outside the U.S. on the applicable type of Form W-8. That form also allows us to apply the correct withholding rate or exemption to your income earned in the U.S. If you don't provide a valid type of Form W-8, we're required to apply the 30% withholding rate, or in some cases, presume you're an uncertified U.S. taxpayer subject to backup withholding on all income and gross proceeds regardless of whether or not it's U.S. sourced.
- Accounts jointly owned by at least one foreign individual or entity must provide a Form W-8 or Form W-9, as applicable, for all of the joint owners.
- Foreign individuals provide a Form W-8BEN. Foreign entities that are the beneficial owner of the income provide a Form W-8BEN-E unless they can make a special withholding exemption claim and instead provide either a Form W-8EXP or Form W-8ECI.
- Entities that act as intermediaries or flow-through entities receiving income on behalf of someone else provide a Form W-8IMY. In some cases, that Form W-8IMY must also include a withholding statement that allocates the income to each of the beneficial owners and copies of the tax certification documentation for those underlying beneficial owners.

If you own your account as an individual or sole proprietor, upon your death, we must be provided with the estate's or successor's IRS Form W-9 or Form W-8. If these are not provided, we may either refuse to pay interest earned on your account from the date of your death or apply backup withholding on the income earned after the date of your death.

**Your tax responsibility**

You're responsible for paying applicable state and local sales taxes on your account fees. These taxes vary by location. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax. We will charge you for all the foregoing taxes and amounts. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax.

**Applicable exchange rate**

In addition to any applicable fees, we make money when we convert one currency to another currency for you. The exchange rate used when we convert one currency to another is set at our sole discretion, and it includes a markup. The markup is designed to compensate us for several considerations including, without limitation, costs incurred, market risks, and our desired return. The applicable exchange rate does not include, and is separate from, any applicable fees. The exchange rate we provide to you may be different from exchange rates you see elsewhere. Different customers may receive different rates for transactions that are the same or similar, and the applicable exchange rate may be different for foreign currency cash, drafts, checks, or wire transfers. Foreign exchange markets are dynamic and rates fluctuate over time based on market conditions, liquidity, and risks. We're your arms-length counterparty on foreign exchange transactions. We may refuse to process any request for a foreign exchange transaction.

**Communications about your account**

**Contacting you for servicing and collection:** We may contact you by phone, text, email, or mail to service your account or collect amounts you owe us. You will provide us accurate and current contact information. We can contact you at any address, phone number, or email address you provide.

When you give us a phone number, you expressly consent that we (and any party acting on our behalf) may contact you by phone call or text message at that number. When we call you, you agree that we may leave prerecorded or artificial voice messages. You also agree that we may use automatic telephone dialing systems in connection with calls or text messages sent to any phone number you give us, even if the receiving number is a mobile phone or other service for which the party called may be charged.

**Monitoring communications:** We can monitor, record, and retain your communications with us at any time without further notice to anyone, unless the laws governing your account require further notice. Monitored and recorded communications include phone conversations, electronic messages and records, and other data transmissions.

**Communicating with authorized signers:** We may provide you or an authorized signer with information about your account. When we receive information from an authorized signer, we treat it as a communication from you. You agree to notify us promptly in writing if an authorized signer no longer has authority on your account.

# Closing Accounts

**If you close your account**

You can request to close your account at any time. To close, the account must be in good standing (for example, it does not have a negative balance, or restrictions such as holds on funds, legal order holds, or court blocks). At closing, we'll assist you in withdrawing or transferring any remaining funds, bringing your account balance to zero. All outstanding items need to be processed and posted to your account and all deposits collected and posted to your account before it closes or items will be returned unpaid afterwards. You must redirect or cancel all scheduled deposits to and payments from (recurring or one-time, in each case) your account; otherwise, they may be returned unpaid after the account closes. We won't be liable for any loss or damage that may result from not honoring items or recurring deposits or payments that are presented or received after your account is closed (such as additional fees charged by a merchant or payee for a returned item).

During the process of closing your account:

- Interest-bearing accounts will stop earning interest.
- Overdraft Protection will be removed.
- All cards and linked accounts will be delinked.
- This Agreement continues to apply.

**Closing a Prime Checking or Premier Checking account:** When you ask us to close your Prime Checking or Premier Checking account, we may take up to three business days to process your request.

**When we can close your account**

We may close your account at any time. If we close your account, we may send the remaining balance on deposit in your account by mail or credit it to another account you keep with us.

**Electronic banking privileges end when account is closed**

All of your electronic banking privileges will be terminated if your account is closed, except that you can view account activity, download statements and tax documents, and perform limited maintenance functions for at least 90 days after closure. If you're enrolled in online banking, refer to the Online Access Agreement for specific terms governing online access to your account.

**Closing your account if the balance is zero**

**Accounts with a zero balance will continue to be charged applicable fees** (like the monthly service fee) until you request to close your account. We may close an account (except analyzed business accounts) with a zero balance on the fee period ending date or at month end without prior notification to you. Once an account is closed (either by you or us), no fees will be assessed on the account.

- To prevent closure by us, an account with a zero balance must have a qualifying transaction posted within the last two months of the most recent fee period ending date. IOLTA and RETA accounts require a qualifying transaction within ten months of the most recent fee period ending date.
- Examples of qualifying transactions are deposits and withdrawals made at a branch, ATM, online, mobile, or via telephone; one-time and recurring transfers made at a branch, ATM, online, mobile, or via telephone; automatic or electronic deposits, such as from payroll or government benefits; automatic or electronic payments, including Bill Pay; one time and recurring purchases or payments made using a card or mobile device; and checks paid from the account. IOLTA and RETA accounts are not eligible for ATM cards or debit cards.
- Bank-originated transactions, like monthly service or other fees, are not considered qualifying transactions that will prevent closure of an account with a zero balance.

## Dormant accounts

Generally, an account with a positive balance becomes dormant if you do not initiate an account-related activity (as determined by the laws governing your account) for a specified period of time.

**Checking accounts, savings accounts, and CDs:** To avoid dormancy, initiate an account-related activity like depositing or withdrawing funds at a branch or ATM, or writing a check from the account. One-time and recurring automatic transactions such as pre-authorized transfers, payments and electronic deposits (including direct deposits), do not prevent the account from becoming dormant, unless otherwise specified by state law.

| Generally, dormancy for: | | |
|---|---|---|
| Checking account | Savings account | CD |
| 12 months | 34 months | 34 months after first renewal |

If any account linked to your Prime Checking or Premier Checking account becomes dormant, that account will be delinked and any benefits will no longer apply (including any fee discount or waiver or special interest rates).

**Individual Retirement Accounts (IRAs) and Education Savings Accounts (ESAs):** Generally, your IRA and ESA (Savings or CD) will become dormant if you don't initiate an account-related activity as follows:

- Traditional IRA becomes dormant if you don't initiate an account-related activity for 34 months or more after you reach age of 70 ½ (if you reached that age prior to January 1, 2020) or 72 (if you did not reach age 70 ½ prior to January 1, 2020)
- Roth IRA won't become dormant unless we receive notification of your death, unless otherwise specified by state law
- ESA becomes dormant after the beneficial owner reaches age 30, unless otherwise specified by state law.

**Safeguards for dormant accounts:** We put safeguards in place to protect a dormant account, which may include restricting the following transactions:

- Transfers between your Wells Fargo accounts using your ATM/debit card
- Transfers by phone using our automated banking service
- Transfers or payments through online, mobile, and text banking (including Bill Pay)
- Wire transfers (incoming and outgoing)
- Contributions or transfers to IRA or ESA savings through online and mobile banking.

Normal monthly service fees and other fees continue to apply throughout the dormancy period.

## When and how accounts escheat

If you do not contact us about your dormant account or initiate an account-related activity within the time period specified by applicable state unclaimed property laws (generally, three or five years), Wells Fargo will close your account and deliver your account funds to that state. This process is known as escheat. Account statements will no longer be accessible through online banking. To recover your account funds, you must file a claim with the state.

**Prime Checking and Premier Checking accounts only:** About two months before escheat of your checking account we'll delink all accounts, and any benefits associated with your Prime Checking or Premier Checking account will no longer apply. See the Consumer Schedule for benefits impacted. To reinstate your Prime Checking or Premier Checking account and associated benefits, you must contact us before your checking account escheats.

# Consumer Accounts Only:
# Resolving Disputes Through Arbitration

**Arbitration Agreement between you and Wells Fargo**

If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A dispute is any unresolved disagreement between Wells Fargo and you. A dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

**Wells Fargo and you each agree to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court.

Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand must pay all of the other party's costs and expenses for compelling arbitration.

**Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general.** If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

**Applicable rules**

Wells Fargo and you each agree that:

- The American Arbitration Association (AAA) will administer each arbitration and the selection of arbitrators according to the AAA's Consumer Arbitration Rules (AAA Rules).
- If there are any differences between the AAA Rules and this Arbitration Agreement, this Arbitration Agreement applies. If this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable.
- Wells Fargo and you are participating in commercial transactions involving the movement of money or goods among states.
- The Federal Arbitration Act (Title 9 of the United States Code) governs this Arbitration Agreement and any arbitration between Wells Fargo and you. If the Act or any part of it is inapplicable, unenforceable or invalid, the state laws governing your relationship with Wells Fargo govern this Arbitration Agreement.

Either Wells Fargo or you may submit a dispute to binding arbitration at any time, regardless of whether a lawsuit or other proceeding has previously begun. For information on initiating arbitration, contact the AAA at 1-800-778-7879.

Each arbitrator must be a licensed attorney with expertise in the laws applicable to the dispute's subject matter. The arbitrator will make a decision regarding the dispute based on applicable law, including any statutes of limitations. The arbitrator may award to either Wells Fargo or you any award or relief provided for by law.

**Fees and expenses**

- **Setting the fees/expenses:** We will pay any costs that are required to be paid by us under the arbitration administrator's rules and procedures, and subject to applicable law. If the arbitrator rules in your favor on any claim presented, we will reimburse you for arbitration filing fees you have paid up to $700.00. Please check with the arbitration administrator to determine the fees applicable to any arbitration you file.
- **Applying state law:** The laws governing your account may limit the amount of fees and expenses you are required to pay in arbitration. Your arbitration fees and expenses will not exceed any applicable limits.
- **Paying for attorney/expert/witness fees:** Unless applicable laws state otherwise, each party will pay its own attorney, expert, and witness fees. This rule applies no matter which party wins arbitration.

**Additional dispute resolution**

Wells Fargo or you each can exercise any lawful rights or use other available remedies to:

- Preserve or obtain possession of property,
- Exercise self-help remedies, including setoff rights, or
- Obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court of competent jurisdiction.

**Arbitration location**

An arbitration will be held in the state whose laws govern your account.

# Business Accounts Only:
# Resolving Disputes Through Arbitration

**Arbitration Agreement between you and Wells Fargo**

If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A "dispute" is any unresolved disagreement between Wells Fargo and you. A "dispute" may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

Except as stated in "No waiver of self-help or provisional remedies" below, Wells Fargo and you agree, at Wells Fargo's or your request, to submit to binding arbitration all claims, disputes, and controversies between or among Wells Fargo and you (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating in any way to your account(s) and/or service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination (each, a "dispute"). **DISPUTES SUBMITTED TO ARBITRATION ARE NOT RESOLVED IN COURT BY A JUDGE OR JURY. TO THE EXTENT ALLOWED BY APPLICABLE LAW, WELLS FARGO AND YOU EACH IRREVOCABLY AND VOLUNTARILY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY FOR ANY DISPUTE ARBITRATED UNDER THIS AGREEMENT.**

Aside from self-help remedies, this Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court. Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand by the other party must pay all of the other party's costs and expenses for compelling arbitration.

**Class action or representative suit not permitted**

Wells Fargo and you agree that the resolution of any dispute arising pursuant to the terms of this Agreement will be resolved by a separate arbitration proceeding and will not be consolidated with other disputes or treated as a class. Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general. If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

**Applicable rules**

Wells Fargo and you each agree that the arbitration will:

- Proceed in a location mutually agreeable to Wells Fargo and you, or if the parties cannot agree, in a location selected by the American Arbitration Association (AAA) in the state whose laws govern your account
- Be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between Wells Fargo and you
- Be conducted by the AAA, or such other administrator as Wells Fargo and you will mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs in which case the arbitration will be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "rules").

If there is any inconsistency between the terms hereof and any such rules, the terms and procedures set forth herein will control. Any party who fails or refuses to submit to arbitration following a lawful demand by any other party will bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein will be deemed to be a waiver by Wells Fargo of the protections afforded to it under 12 U.S.C. Section 91 or any similar applicable state law.

**No waiver of self-help or provisional remedies**

This arbitration requirement does not limit the right of Wells Fargo or you to:

1. Exercise self-help remedies, including setoff or
2. Obtain provisional or ancillary remedies such as injunctive relief or attachment, before, during, or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in (1) and (2) above.

**Arbitrator's qualifications and power**

Any dispute in which the amount in controversy is $5,000,000 or less will be decided by a single arbitrator selected according to the rules, and who will not render an award of greater than $5,000,000. Any dispute in which the amount in controversy exceeds $5,000,000 will be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. Each arbitrator will be a neutral attorney licensed in the state whose laws govern your account, or a neutral, retired judge in such state, in either case with a minimum of ten years' experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator(s) will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim.

In any arbitration proceeding the arbitrator(s) will decide (by documents only or with a hearing at the discretion of the arbitrator(s)) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator(s) will resolve all disputes in accordance with the substantive law of the state whose laws govern your account and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator(s) will also have the power to award recovery of all costs and fees, to impose sanctions, and to take such other action as deemed necessary to the same extent a judge could pursuant to the federal rules of civil procedure, the state rules of civil procedure for the state whose laws govern your account, or other applicable law. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy will not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

**Discovery**

In any arbitration proceeding, discovery will be permitted in accordance with the rules. All discovery will be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

**Fees and expenses**

The arbitrator will award all costs and expenses of the arbitration proceeding.

**Additional rules for an arbitration proceeding**

To the maximum extent practicable, the AAA, the arbitrator(s), Wells Fargo and you will take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. The arbitrator(s), Wells Fargo or you may not disclose the existence, content, or results thereof, except for disclosures of information by Wells Fargo or you required in the ordinary course of business, by applicable law or regulation, or to the extent necessary to exercise any judicial review rights set forth herein. If more than one agreement for arbitration by or between Wells Fargo and you potentially applies to a dispute, the arbitration agreement most directly related to your account or the subject matter of the dispute will control. This arbitration agreement will survive the closing of your account or termination of any service or the relationship between Wells Fargo and you.

**The right to pursue claims in small claims court**

Notwithstanding anything to the contrary, Wells Fargo and you each retains the right to pursue in small claims court a dispute within that court's jurisdiction. Further, this arbitration agreement will apply only to disputes in which either party seeks to recover an amount of money (excluding attorneys' fees and costs) that exceeds the jurisdictional limit of the small claims court.

# Additional Terms and Services

**Laws governing your account**

This Agreement, your accounts, services and any related disputes are governed by United States law and (when not superseded by United States law) the laws of the state where you opened your account (without regard to conflict of laws principles).

For consumer and business accounts (except analyzed business accounts), your account statement identifies which state's laws govern your account. If a different state law applies, we'll notify you.

Any funds transfer (including a wire transfer) that is a remittance transfer as defined in Regulation E, Subpart B, will be governed by the laws of the United States and, to the extent applicable, the laws of the state of New York, including New York's version of Article 4A of the Uniform Commercial Code, without regard to its conflict of laws principles.

**Controlling language**

English is the controlling language of our relationship with you, including the terms of this Agreement. Items you write such as checks or withdrawal slips must be written in English. For your convenience, we may, but are not obligated to (unless required by law), translate some forms, disclosures, and advertisements into another language, but if there's a discrepancy, the English version prevails over the translation.

**Order of precedence between agreements**

If a service we offer has a separate agreement, and there's a conflict between the terms of this Agreement and the separate agreement, the conflicting terms of the separate agreement will apply.

**Legal process**

Legal process includes any levy, garnishment or attachment, tax levy or withholding order, injunction, restraining order, subpoena, search warrant, government agency request for information, forfeiture or seizure, and other legal process relating to your account.

We may accept and act on any legal process we believe to be valid regardless of how and where it is served, including if process is served in locations, states, or jurisdictions other than where the account was opened or where the account, property, or records are located.

We may, but are not required to, provide notice of legal process relating to your accounts. We may comply with legal process even though it affects the interests of only one owner or authorized signer of a joint account. Regardless of any action we take, we are not waiving any rights of exemption you may have under any federal or state laws. You are responsible for invoking any exemption rights not otherwise asserted on your behalf.

Any fees, expenses (including attorney's fees and expenses), or losses we incur as a result of responding to legal process related to your account are your responsibility. We may charge these costs to any account you maintain with us.

**Legal dispute location**

Any lawsuit, claim, or other proceeding arising from or relating to your account or this Agreement, will take place exclusively in the state or federal courts in the state whose laws govern your account, without regard to conflict of laws principles. This includes enforcement of the Arbitration Agreement and entry of judgment on any arbitration award.

**Changes to this Agreement**

We may change the terms of this Agreement, including account fees and features, at any time by adding new terms or conditions, or by modifying or deleting existing ones. If we're required to notify you of a change to this Agreement, we'll describe the change and its effective date in a message within your account statement or by any other appropriate means. We may agree in writing to waive a term of this Agreement, including a fee, and we may revoke any waiver.

**Modification of invalid terms**

Any term of this Agreement that is inconsistent with the laws governing your account will be excluded to the extent of such invalidity. The invalid term will be considered modified by us and applied in a manner consistent with such laws. Such modification won't affect the enforceability or validity of the remaining terms of this Agreement.

**Timing of notices**

Any notice you send us is effective once we receive it and have a reasonable opportunity to act on it.

**Responsibilities and liabilities between Wells Fargo and you**

We're responsible for exercising ordinary care and complying with this Agreement.

When we take an item for processing by automated means, ordinary care does not require us to examine the item. In all other cases, ordinary care requires only that we follow standards that don't vary unreasonably from the general standards followed by similarly situated banks.

Except to the extent we fail to exercise ordinary care or to comply with this Agreement, and to the extent permitted by applicable federal or state laws, you agree to indemnify and hold us harmless from all claims, demands, losses, liabilities, judgments, and expenses (including attorney's fees and expenses) arising out of or in any way connected with our performance under this Agreement. This indemnification will survive termination of this Agreement.

We won't be liable for anything we do when following your instructions. In addition, we won't be liable if we don't follow your instructions if we reasonably believe that your instructions would expose us to potential loss or civil or criminal liability, or conflict with customary banking practices. In no event will either Wells Fargo or you be liable to the other for any special, consequential, indirect, or punitive damages. The limitation doesn't apply where the laws governing your account prohibit it. We won't have any liability to you if your account does not have sufficient available funds to pay your items due to actions we have taken in accordance with this Agreement.

Circumstances beyond your control or ours may arise and make it impossible for us to provide services to you or for you to perform your duties under this Agreement. If this happens, neither Wells Fargo nor you will be in breach of this Agreement. If we waive a right with respect to your account on one or more occasions, it does not mean we're obligated to waive the same right on any other occasion.

**Your obligation to pay our fees**

We're permitted to either directly debit your account or bill you for our fees, expenses and taxes incurred in connection with your account and any service.  If the available funds in your account are not sufficient to cover the debit, we may create an overdraft on your account.

**Setoff and security interest**

**Our setoff rights:** If you owe us any money, we have the right to apply funds in any of your accounts to pay your debt. This is known as setoff. When we exercise this right, we reduce the funds in your account(s) by the amount of the debt that is due or past due as allowed by the laws governing your account. We're not required to give you any prior notice to exercise our right of setoff.

A debt includes any amount you owe individually or together with someone else both now or in the future. It includes any overdrafts and our fees. If your account is a joint account, we may setoff funds in it to pay the debt of any joint owner.

If your account is an unmatured CD, then we may deduct an early withdrawal penalty. This may be due as a result of our having exercised our right of setoff. See "Early withdrawal penalty and Regulation D penalty" in the "Time Accounts (CDs)" section of this Agreement.

**Consumer accounts only:** Our right to setoff extends to any federal or state benefit payments (including Social Security benefits) deposited to your account, subject to applicable law. If we're obligated to return any federal or state benefits deposited to your accounts after you're no longer eligible to receive them, we may setoff against any of your accounts to recover the payments you were ineligible to receive. Our right of setoff won't apply if it would invalidate the tax-deferred status of any tax-deferred retirement account (e.g., a SEP or an IRA) you keep with us.

**Security interest:** To ensure you pay us all amounts you owe us under this Agreement (e.g., overdrafts and fees), you grant us a lien on and security interest in each account you keep with us. By opening and keeping each account with us, you consent to our asserting our security interest should the laws governing this Agreement require your consent. Our rights under this security interest are in addition to and apart from any other rights under any other security interest you may have granted to us.

You may not grant a security interest in, transfer, or assign your accounts to anyone other than us without our written agreement.

# Glossary

**Access device:** a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers.

**ACH:** the Automated Clearing House Network.

**ACH debit entry:** an electronic instruction requesting the withdrawal of funds from your account through ACH.

**ACH transaction:** a deposit or payment transferred to or from your account through an ACH.

**Analyzed business account:** a checking account for which fees are billed through account analysis. Some analyzed accounts offer an earnings allowance to offset eligible fees. Examples of analyzed business accounts include the following: Optimize Business Checking℠, Analyzed Business Checking, and Analyzed Interest on Lawyers Trust Account (IOLTA).

**Authorized signer:** a person who has actual or apparent authority to use your account even if they have not signed the account application.

**Available balance:** our most current record of the amount of money available for your use or withdrawal. For more information, see the "Available Balance, Posting Transactions, and Overdraft" section in this Agreement.

**Business account:** any deposit account, other than one of Wells Fargo's commercial deposit accounts, which isn't established and kept for personal, family, or household purposes. Common examples of ownership include an individual acting as a sole proprietor, a partnership, a limited partnership, a limited liability partnership, a limited liability company, a corporation, a joint venture, a nonprofit corporation, an employee benefit plan, or a governmental unit including an Indian tribal entity.

**Business day:** every day except Saturday, Sunday, and federal holidays.

**Card:** every type of debit card and ATM card we may issue, except any prepaid cards or the business deposit card.

**Collected balance:** the ending daily balance in your account after all credits and debits have posted, minus deposited items that have not yet been collected from the originating financial institution. The collected balance is the balance on which interest is calculated for all interest-bearing checking accounts and for all savings accounts.

**Consumer account:** any deposit account which is established and kept for personal, family, or household purposes and isn't intended for business use. A consumer account can be owned by one or more individuals.

**Digital wallet:** a digital wallet is a way to carry your credit and debit card information in a secure digital form on your mobile device (smartphone, smartwatch, tablet). Instead of using your physical plastic card to make purchases, a digital wallet allows you to pay in stores, in apps, or online.

**Direct deposit:** an automatic electronic deposit of your salary, pension, Social Security, or other regular income deposited through the ACH network to your Wells Fargo deposit account by your employer or an outside agency.

**Endorsement:** a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check.

**Fee period:** see the "Overview and Key Terms" section of the Consumer Schedule or Business Schedule, as applicable.

**Item:** any order, instruction, or authorization to withdraw or pay funds or money from or to an account. Examples include a check, draft, money order, ACH, wire transfer, Bill Pay, other electronic transfer, ATM withdrawal, teller withdrawal, debit card purchase, and fee.

**Overdraft:** an available balance of less than $0.00 in your account.

**Returned item / Non-sufficient funds (NSF):** a term used to indicate when an item presented for payment is returned unpaid because the available balance in your deposit account is less than the amount of the item when presented.

**Statement period:** The dates of your statement period are located on your account statement, which provides you a record of all transactions posted during that period. Statement periods can be of varying length, including monthly, quarterly, semi-annual, or annual.

This Deposit Account Agreement governs deposit accounts maintained at Wells Fargo Bank, N.A.

© 2022 Wells Fargo Bank, N.A. Member FDIC.

CCB2018 (11/15/2022)

# EXHIBIT 3

# Navigate Business Checking℠

July 31, 2023 ■ Page 1 of 8



CAPITAL (360), INC
33425 SPINNAKER DR N
DANA POINT CA 92629-4434

## Questions?

*Available by phone Mon-Sat 7:00am-11:00pm Eastern Time, Sun 9:00am-10:00pm Eastern Time:*
We accept all relay calls, including 711

**1-800-CALL-WELLS**  (1-800-225-5935)

*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Visit wellsfargo.com/digitalbusinessresources to explore tours, articles, infographics, and other resources on the topics of money movement, account management and monitoring, security and fraud prevention, and more.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s).  Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☑ |
| Online Statements | ☑ |
| Business Bill Pay | ☑ |
| Business Spending Report | ☑ |
| Overdraft Protection | ☐ |

## Statement period activity summary

| | |
|---|---|
| Beginning balance on 7/1 | $1,375,319.23 |
| Deposits/Credits | 7,239,525.96 |
| Withdrawals/Debits | - 10,021,951.22 |
| **Ending balance on 7/31** | **-$1,407,106.03** |

Account number: ■■■■■5813

**CAPITAL (360), INC**

*California account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

## Overdraft Protection

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo branch.

WELLS FARGO

## Interest summary

| | |
|---|---|
| Interest paid this statement | $25.96 |
| Average collected balance | $306,950.22 |
| Annual percentage yield earned | 0.10% |
| Interest earned this statement period | $25.96 |
| Interest paid this year | $135.69 |

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 7/3 | | eDeposit IN Branch/Store 07/03/23 04:32:45 PM 32331 Golden Lantern Laguna Niguel CA 6810 | 818,000.00 | | |
| 7/3 | 3087 | Deposited OR Cashed Check | | 13,500.00 | |
| 7/3 | 3088 | Deposited OR Cashed Check | | 9,500.00 | |
| 7/3 | | Zelle to Franz Thomas on 07/02 Ref #Rp0Rcy26RN Tax Filing 2023 | | 1,355.00 | |
| 7/3 | 3089 | Check | | 8,000.00 | |
| 7/3 | 3013 | Check | | 15,000.00 | |
| 7/3 | | Medical Payment Providence St-D2C7S1T3S6B8 Frank Arlasky | | 117.00 | |
| 7/3 | 3091 | Check | | 10,000.00 | |
| 7/3 | 3077 | Check | | 61,000.00 | |
| 7/3 | 3078 | Check | | 63,000.00 | |
| 7/3 | 3079 | Check | | 68,000.00 | |
| 7/3 | 3080 | Check | | 68,000.00 | |
| 7/3 | 3071 | Check | | 75,000.00 | |
| 7/3 | 3072 | Check | | 75,000.00 | |
| 7/3 | 3083 | Check | | 78,000.00 | |
| 7/3 | 3076 | Check | | 78,000.00 | |
| 7/3 | 3082 | Check | | 78,000.00 | |
| 7/3 | 3084 | Check | | 79,000.00 | |
| 7/3 | 3085 | Check | | 83,000.00 | |
| 7/3 | 3002 | Check | | 2,100.00 | |
| 7/3 | 3006 | Check | | 2,490.00 | 1,325,257.23 |
| 7/5 | | eDeposit IN Branch/Store 07/05/23 09:07:42 Am 32331 Golden Lantern Laguna Niguel CA 6810 | 157,000.00 | | |
| 7/5 | | ATM Check Deposit on 07/05 32331 Golden Lantern Laguna Niguel CA 0006765 ATM ID 0955D Card 6810 | 243,000.00 | | |
| 7/5 | | eDeposit IN Branch/Store 07/05/23 03:56:14 PM 32331 Golden Lantern Laguna Niguel CA 6810 | 555,500.00 | | |
| 7/5 | | Online Transfer to Dsa Exhaust, LLC Business Checking xxxxxx9878 Ref #Ib0K2223Hr on 07/04/23 | | 3,000.00 | |
| 7/5 | | Withdrawal Made In A Branch/Store | | 1,080,000.00 | |
| 7/5 | | Nationwide EDI Pymnts Nbp0168427812 Frank Arlasky | | 106.47 | |
| 7/5 | 3019 | Check | | 2,490.00 | |
| 7/5 | 3040 | Check | | 69,000.00 | |
| 7/5 | 3073 | Check | | 73,000.00 | |
| 7/5 | 3074 | Check | | 73,000.00 | |
| 7/5 | 3075 | Check | | 73,000.00 | |
| 7/5 | 3041 | Check | | 76,000.00 | |
| 7/5 | 3081 | Check | | 77,000.00 | |
| 7/5 | 3044 | Check | | 79,000.00 | |
| 7/5 | 3043 | Check | | 79,000.00 | |
| 7/5 | 3045 | Check | | 81,000.00 | |
| 7/5 | 3042 | Check | | 82,000.00 | |
| 7/5 | < | Business to Business ACH Debit - Capital One Online Pmt 230705 3Rx959Hk4Jtx4Q4 Frank J Arlasky | | 109.72 | |
| 7/5 | | Discover E-Payment 230705 0969 Arlasky Frank | | 857.97 | |
| 7/5 | 3001 | Check | | 107.90 | |
| 7/5 | 3007 | Check | | 373.50 | |

July 31, 2023 ■ Page 3 of 8



*Transaction history(continued)*

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 7/5 | 3012 | Check | | 373.50 | |
| 7/5 | | Check | | 405.00 | |
| 7/5 | 3016 | Check | | 415.00 | |
| 7/5 | 3009 | Check | | 830.00 | |
| 7/5 | 3005 | Check | | 833.33 | |
| 7/5 | 3000 | Check | | 2,324.00 | |
| 7/5 | 3003 | Check | | 4,565.00 | 421,965.84 |
| 7/6 | | eDeposit IN Branch/Store 07/06/23 03:26:18 PM 32331 Golden Lantern Laguna Niguel CA 6810 | 844,000.00 | | |
| 7/6 | | ATM Check Deposit on 07/06 32331 Golden Lantern Laguna Niguel CA 0006929 ATM ID 0955D Card 6810 | 9,000.00 | | |
| 7/6 | 3010 | Deposited OR Cashed Check | | 2,531.50 | |
| 7/6 | | SD Gas & Elec Paid Sdge 005990668360 Sandy,White | | 248.14 | |
| 7/6 | 3017 | Check | | 4,980.00 | |
| 7/6 | 3008 | Check | | 291.00 | |
| 7/6 | < | Business to Business ACH Debit - Desert Financial D000526706 230706 Capital360Inc | | 882.03 | |
| 7/6 | 3039 | Check | | 68,000.00 | |
| 7/6 | 3060 | Check | | 70,000.00 | |
| 7/6 | 3059 | Check | | 71,000.00 | |
| 7/6 | 3058 | Check | | 73,000.00 | |
| 7/6 | 3057 | Check | | 74,000.00 | |
| 7/6 | 3070 | Check | | 75,000.00 | |
| 7/6 | 3069 | Check | | 76,000.00 | |
| 7/6 | 3047 | Check | | 78,000.00 | |
| 7/6 | 3067 | Check | | 79,000.00 | |
| 7/6 | 3046 | Check | | 79,000.00 | |
| 7/6 | 3068 | Check | | 79,000.00 | 444,033.17 |
| 7/7 | | eDeposit IN Branch/Store 07/07/23 10:08:45 AM 32331 Golden Lantern Laguna Niguel CA 6810 | 865,000.00 | | |
| 7/7 | | Non-WF ATM Withdrawal authorized on 07/07 30605 Gateway Pl Rancho Missio CA 383188665405510 ATM ID CA4035 Card 6810 | | 203.50 | |
| 7/7 | 3090 | Check | | 1,200.00 | |
| 7/7 | 3051 | Check | | 71,000.00 | |
| 7/7 | 3056 | Check | | 74,000.00 | |
| 7/7 | 3055 | Check | | 75,000.00 | |
| 7/7 | 3054 | Check | | 75,000.00 | |
| 7/7 | 3062 | Check | | 76,000.00 | |
| 7/7 | 2973 | Check | | 77,000.00 | |
| 7/7 | 3053 | Check | | 77,000.00 | |
| 7/7 | 3064 | Check | | 78,000.00 | |
| 7/7 | 3052 | Check | | 79,000.00 | |
| 7/7 | 2975 | Check | | 80,000.00 | |
| 7/7 | 3063 | Check | | 81,000.00 | 464,629.67 |
| 7/10 | | eDeposit IN Branch/Store 07/10/23 03:57:13 PM 1601 McCulloch Blvd N Lake Havasu City AZ 6810 | 972,000.00 | | |
| 7/10 | < | Business to Business ACH Debit - American Express ACH Pmt 230710 W4478 Frank Arlasky | | 31,051.02 | |
| 7/10 | 3015 | Check | | 332.00 | |
| 7/10 | 3011 | Check | | 6,500.00 | |
| 7/10 | 3093 | Check | | 61,000.00 | |
| 7/10 | 3092 | Check | | 63,000.00 | |
| 7/10 | 3094 | Check | | 64,000.00 | |
| 7/10 | 3050 | Check | | 73,000.00 | |
| 7/10 | 3061 | Check | | 74,000.00 | |
| 7/10 | 3049 | Check | | 74,000.00 | |
| 7/10 | 3048 | Check | | 74,000.00 | |
| 7/10 | 3098 | Check | | 75,000.00 | |
| 7/10 | 3097 | Check | | 76,000.00 | |
| 7/10 | 3096 | Check | | 77,000.00 | |
| 7/10 | 3066 | Check | | 77,000.00 | |
| 7/10 | 3095 | Check | | 78,000.00 | |
| 7/10 | 3065 | Check | | 80,000.00 | 452,746.65 |

July 31, 2023 ■ Page 4 of 8

WELLS FARGO

---

## Transaction history(continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|-------------|---------|---------|---------|
| 7/11 | | eDeposit IN Branch/Store 07/11/23 03:15:33 PM 1601 McCulloch Blvd N Lake Havasu City AZ 6810 | 936,000.00 | | |
| 7/11 | | Direct Pay Monthly Base | | 10.00 | |
| 7/11 | | Purchase authorized on 07/10 Bassett Furniture Bassett VA S303191725673167 Card 6810 | | 1,044.36 | |
| 7/11 | 3004 | Check | | 581.00 | |
| 7/11 | 3109 | Check | | 69,000.00 | |
| 7/11 | 3111 | Check | | 70,000.00 | |
| 7/11 | 3120 | Check | | 73,000.00 | |
| 7/11 | 3100 | Check | | 74,000.00 | |
| 7/11 | 3099 | Check | | 75,000.00 | |
| 7/11 | 3119 | Check | | 76,000.00 | |
| 7/11 | 3115 | Check | | 77,000.00 | |
| 7/11 | 3116 | Check | | 77,000.00 | |
| 7/11 | 3118 | Check | | 79,000.00 | |
| 7/11 | 3114 | Check | | 79,000.00 | |
| 7/11 | 3102 | Check | | 80,000.00 | |
| 7/11 | 3101 | Check | | 81,000.00 | |
| 7/11 | 3117 | Check | | 83,000.00 | 394,111.29 |
| 7/12 | | eDeposit IN Branch/Store 07/12/23 10:58:24 Am 32331 Golden Lantern Laguna CA | 161,000.00 | | |
| 7/12 | | eDeposit IN Branch/Store 07/12/23 01:21:18 PM 1601 McCulloch Blvd N Lake Havasu City AZ 6810 | 859,000.00 | | |
| 7/12 | 3122 | Deposited OR Cashed Check | | 14,166.00 | |
| 7/12 | | Mass Mutual Repay Chek Jul 23 06100320092100 Frank J Arlasky | | 400.00 | |
| 7/12 | < | Business to Business ACH Debit - Lifesimple Techn Sale 230712 Frank Arlasky | | 17,121.28 | |
| 7/12 | 3121 | Check | | 68,000.00 | |
| 7/12 | 3106 | Check | | 69,000.00 | |
| 7/12 | 3110 | Check | | 70,000.00 | |
| 7/12 | 3108 | Check | | 73,000.00 | |
| 7/12 | 3105 | Check | | 74,000.00 | |
| 7/12 | 3107 | Check | | 75,000.00 | |
| 7/12 | 3249 | Check | | 77,000.00 | |
| 7/12 | 3250 | Check | | 78,000.00 | |
| 7/12 | 3104 | Check | | 79,000.00 | |
| 7/12 | 3248 | Check | | 80,000.00 | |
| 7/12 | 3112 | Check | | 82,000.00 | |
| 7/12 | 3113 | Check | | 83,000.00 | |
| 7/12 | 3103 | Check | | 83,000.00 | |
| 7/12 | 3159 | Check | | 3,160.00 | 388,264.01 |
| 7/13 | | Mobile Deposit : Ref Number :712130212268 | 18,000.00 | | 406,264.01 |
| 7/17 | | ATM Check Deposit on 07/16 32331 Golden Lantern Laguna Niguel CA 0008371 ATM ID 0955C Card 6810 | 415,000.00 | | |
| 7/17 | | ATM Check Deposit on 07/17 32331 Golden Lantern Laguna Niguel CA 0008421 ATM ID 0955C Card 6810 | 387,000.00 | | 1,208,264.01 |
| 7/20 | | Cashed/Deposited Item Retn Unpaid Fee | | 60.00 | |
| 7/20 | | Deposited Item Retn Unpaid - Paper 230720 | | 387,000.00 | 821,204.01 |
| 7/21 | | Cashed/Deposited Item Retn Unpaid Fee | | 120.00 | |
| 7/21 | | Deposited Item Retn Unpaid - Paper 230721 | | 793,000.00 | 28,084.01 |
| 7/24 | | Cashed/Deposited Item Retn Unpaid Fee | | 156.00 | |
| 7/24 | | Deposited Item Retn Unpaid - Paper 230724 | | 1,020,000.00 | -992,071.99 |
| 7/26 | | Cashed/Deposited Item Retn Unpaid Fee | | 60.00 | |



## Transaction history(continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------|-------------|---------|------------|---------|
| 7/26 | | Deposited Item Retn Unpaid - Paper 230726 | | 415,000.00 | -1,407,131.99 |
| 7/31 | | Interest Payment | 25.96 | | -1,407,106.03 |
| Ending balance on 7/31 | | | | | -1,407,106.03 |
| Totals | | | $7,239,525.96 | $10,021,951.22 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

<  Business to Business ACH:  If this is a business account, this transaction has a return time frame of one business day from post date. This time frame does not apply to consumer accounts.

## Summary of checks written(checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| | 7/5 | 405.00 | 3051 | 7/7 | 71,000.00 | 3084 | 7/3 | 79,000.00 |
| 2973 | 7/7 | 77,000.00 | 3052 | 7/7 | 79,000.00 | 3085 | 7/3 | 83,000.00 |
| 2975 * | 7/7 | 80,000.00 | 3053 | 7/7 | 77,000.00 | 3087 * | 7/3 | 13,500.00 |
| 3000 * | 7/5 | 2,324.00 | 3054 | 7/7 | 75,000.00 | 3088 | 7/3 | 9,500.00 |
| 3001 | 7/5 | 107.90 | 3055 | 7/7 | 75,000.00 | 3089 | 7/3 | 8,000.00 |
| 3002 | 7/3 | 2,100.00 | 3056 | 7/7 | 74,000.00 | 3090 | 7/7 | 1,200.00 |
| 3003 | 7/5 | 4,565.00 | 3057 | 7/6 | 74,000.00 | 3091 | 7/3 | 10,000.00 |
| 3004 | 7/11 | 581.00 | 3058 | 7/6 | 73,000.00 | 3092 | 7/10 | 63,000.00 |
| 3005 | 7/5 | 833.33 | 3059 | 7/6 | 71,000.00 | 3093 | 7/10 | 61,000.00 |
| 3006 | 7/3 | 2,490.00 | 3060 | 7/6 | 70,000.00 | 3094 | 7/10 | 64,000.00 |
| 3007 | 7/5 | 373.50 | 3061 | 7/10 | 74,000.00 | 3095 | 7/10 | 78,000.00 |
| 3008 | 7/6 | 291.00 | 3062 | 7/7 | 76,000.00 | 3096 | 7/10 | 77,000.00 |
| 3009 | 7/5 | 830.00 | 3063 | 7/7 | 81,000.00 | 3097 | 7/10 | 76,000.00 |
| 3010 | 7/6 | 2,531.50 | 3064 | 7/7 | 78,000.00 | 3098 | 7/10 | 75,000.00 |
| 3011 | 7/10 | 6,500.00 | 3065 | 7/10 | 80,000.00 | 3099 | 7/11 | 75,000.00 |
| 3012 | 7/5 | 373.50 | 3066 | 7/10 | 77,000.00 | 3100 | 7/11 | 74,000.00 |
| 3013 | 7/3 | 15,000.00 | 3067 | 7/6 | 79,000.00 | 3101 | 7/11 | 81,000.00 |
| 3015 * | 7/10 | 332.00 | 3068 | 7/6 | 79,000.00 | 3102 | 7/11 | 80,000.00 |
| 3016 | 7/5 | 415.00 | 3069 | 7/6 | 76,000.00 | 3103 | 7/12 | 83,000.00 |
| 3017 | 7/6 | 4,980.00 | 3070 | 7/6 | 75,000.00 | 3104 | 7/12 | 79,000.00 |
| 3019 * | 7/5 | 2,490.00 | 3071 | 7/3 | 75,000.00 | 3105 | 7/12 | 74,000.00 |
| 3039 * | 7/6 | 68,000.00 | 3072 | 7/3 | 75,000.00 | 3106 | 7/12 | 69,000.00 |
| 3040 | 7/5 | 69,000.00 | 3073 | 7/5 | 73,000.00 | 3107 | 7/12 | 75,000.00 |
| 3041 | 7/5 | 76,000.00 | 3074 | 7/5 | 73,000.00 | 3108 | 7/12 | 73,000.00 |
| 3042 | 7/5 | 82,000.00 | 3075 | 7/5 | 73,000.00 | 3109 | 7/11 | 69,000.00 |
| 3043 | 7/5 | 79,000.00 | 3076 | 7/3 | 78,000.00 | 3110 | 7/12 | 70,000.00 |
| 3044 | 7/5 | 79,000.00 | 3077 | 7/3 | 61,000.00 | 3111 | 7/11 | 70,000.00 |
| 3045 | 7/5 | 81,000.00 | 3078 | 7/3 | 63,000.00 | 3112 | 7/12 | 82,000.00 |
| 3046 | 7/6 | 79,000.00 | 3079 | 7/3 | 68,000.00 | 3113 | 7/12 | 83,000.00 |
| 3047 | 7/6 | 78,000.00 | 3080 | 7/3 | 68,000.00 | 3114 | 7/11 | 79,000.00 |
| 3048 | 7/10 | 74,000.00 | 3081 | 7/5 | 77,000.00 | 3115 | 7/11 | 77,000.00 |
| 3049 | 7/10 | 74,000.00 | 3082 | 7/3 | 78,000.00 | 3116 | 7/11 | 77,000.00 |
| 3050 | 7/10 | 73,000.00 | 3083 | 7/3 | 78,000.00 | 3117 | 7/11 | 83,000.00 |

July 31, 2023 ■ Page 6 of 8

**WELLS FARGO**

## Summary of checks written (continued)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 3118 | 7/11 | 79,000.00 | 3121 | 7/12 | 68,000.00 | 3248 * | 7/12 | 80,000.00 |
| 3119 | 7/11 | 76,000.00 | 3122 | 7/12 | 14,166.00 | 3249 | 7/12 | 77,000.00 |
| 3120 | 7/11 | 73,000.00 | 3159 * | 7/12 | 3,160.00 | 3250 | 7/12 | 78,000.00 |

* Gap in check sequence.

## Items returned unpaid

| Date | Description | Amount |
|------|-------------|--------|
| 7/14 | Check Reference # 00007251008812698196 | 9,062.77 |
| 7/17 | Check Reference # 00007340008812765271 | 1,093.00 |
| 7/17 | Check Reference # 00008025008715058474 | 2,490.00 |
| 7/18 | Check Reference # 00007251008114669994 | 9,062.77 |
| 7/20 | Check Reference # 00007340008614253031 | 1,093.00 |

## Monthly service fee summary

For a complete list of fees and detailed account information, see the disclosures applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 07/01/2023 - 07/31/2023 | Standard monthly service fee $25.00 | You paid $0.00 |
|---|---|---|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| • Minimum daily balance | $10,000.00 | -$1,407,131.99 ☐ |
| • Combined balance in linked accounts, which may include | $15,000.00 | $201,322.67 ☑ |
|   - Average ledger balance in your Navigate Business Checking, Initiate Business Checking, and Additional Navigate Business Checking, plus | | |
|   - Average ledger balance in your Business Market Rate Savings, and Business Platinum Savings, plus | | |
|   - Average ledger balance in your Business Time Account and Business Step Rate Time Account | | |

WK/WK

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 20,000 | 0 | 0.0030 | 0.00 |
| Transactions | 221 | 250 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |





# ✔ IMPORTANT ACCOUNT INFORMATION

Effective July 25, 2023, the paragraph in the "Standard Overdraft Coverage" subsection of the "Available Balance, Posting Transactions, and Overdraft" section of the Deposit Account Agreement that reads:

"The decision to pay a transaction into overdraft is made at our sole discretion. Generally, we base this decision on criteria such as your account history, deposits you make, and the transaction amount. We reserve the right to not pay a transaction into overdraft."

is deleted and replaced with the following:

When you don't have a sufficient available balance in your account (or in accounts linked for Overdraft Protection as described below), the decision to authorize or pay a transaction into overdraft is made at our sole discretion, and we reserve the right to decline or return a transaction that would result in an overdraft. We reserve this discretion regardless of whether we've previously honored or dishonored overdrafts.

We base our decision to authorize or pay a transaction into overdraft on criteria that includes, but is not limited to, your account history, deposits you make, and transaction characteristics.

When you make or schedule payments to a merchant (including payments made through another service provider, such as a digital wallet or other payment platform), it is important for you to understand your rights and responsibilities under any applicable agreement you may have with the merchant or service provider - including the methods in which they process transactions and what occurs if the Bank declines your transaction or returns it unpaid. The Bank does not assess fees for declined or returned transactions, but the merchant or service provider may assess fees or other penalties. Even if a merchant or service provider has approved or processed your transaction, you should not assume that the transaction will be authorized or paid by us when we become aware of the transaction and you do not have sufficient available funds in your bank account.

NEW YORK CITY CUSTOMERS ONLY -- Pursuant to New York City regulations, we request that you contact us at 1-800-TO WELLS (1-800-869-3557) to share your language preference.

**WELLS FARGO**

## Important Information You Should Know

- **To dispute or report inaccuracies in information we have furnished to a Consumer Reporting Agency about your accounts:** Wells Fargo Bank, N.A. may furnish information about deposit accounts to Early Warning Services. You have the right to dispute the accuracy of information that we have furnished to a consumer reporting agency by writing to us at Overdraft Collection and Recovery, P.O. Box 5058, Portland, OR 97208-5058. Include with the dispute the following information as available: Full name (First, Middle, Last), Complete address, The account number or other information to identify the account being disputed, Last four digits of your social security number, Date of Birth. Please describe the specific information that is inaccurate or in dispute and the basis for the dispute along with supporting documentation. If you believe the information furnished is the result of identity theft, please provide us with an identity theft report.

- **In case of errors or questions about other transactions (that are not electronic transfers):** Promptly review your account statement within 30 days after we made it available to you, and notify us of any errors.

- **If your account has a negative balance:** Please note that an account overdraft that is not resolved 60 days from the date the account first became overdrawn will result in closure and charge off of your account. In this event, it is important that you make arrangements to redirect recurring deposits and payments to another account. The closure will be reported to Early Warning Services. We reserve the right to close and/or charge-off your account at an earlier date, as permitted by law. The laws of some states require us to inform you that this communication is an attempt to collect a debt and that any information obtained will be used for that purpose.

- To download and print an Account Balance Calculation Worksheet(PDF) to help you balance your checking or savings account, enter www.wellsfargo.com/balancemyaccount in your browser on either your computer or mobile device.

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your                     $ _____
register or transfers into                               $ _____
your account which are not                            $ _____
shown on your statement.                            + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
.                                                          **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total amount** | $ |

©2021 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# EXHIBIT 4

# Consumer Account Application

(114)

Bank name
Aliso Viejo Office

| Account(s) I Want to Open | Bank Use Only |
|---|---|
| 8261 | |
| 4839 | |
| 7460 | |

Cust #2

| Customer Information | | | Customer Information | | |
|---|---|---|---|---|---|
| Full name | | | Full name | | |
| David M. Tofolo | | | Gloria D. Tofolo | | |
| Street address | How long at this address Yr / Mo | | Street address | How long at this address Yr / Mo | |
| 9 Sierra Vista | | | 23132 Capri Court. | 6. | |
| City | State | Zip code | City | State | Zip code |
| Laguna Niguel | | 92677 | L.N. | CA | 92677 |
| Taxpayer Identification number (TIN) | | Home phone | Taxpayer Identification number (TIN) | | Home phone |
| | | (949) 495-8724 | | | (949) 703-6561 |
| Previous street address | | How long at this address Yr / Mo | Previous street address | | How long at this address Yr / Mo |
| same. | | | | | |
| City | State | Zip code | City | State | Zip code |
| Current employer | | Business telephone number | Current employer | | Business telephone number |
| IBM | | (714) 271-3065. | Retired. | | |
| Current employer's address | | How long with employer Yr / Mo | Current employer's address | | How long with employer Yr / Mo |
| (800) Anton Blvd | | | | | |
| City | State | | City | State | |
| Costa Mesa CA | | | CADL B4125735 | | |
| Driver's license or other identification number | | Date of birth | Driver's license or other identification number | | Date of birth |
| CADL | | 1/02 11/22/65 | Gloria D Tofolo | 09/20/41 | |
| existing | | 8/96 | existing | | 8/96. |

## My Previous Account (most recent)
Name of financial institution and city | Checking account number

Verification

## Request for Taxpayer Identification Number and Certification   (Substitute Form W-9)
**Certification:** Under penalties of perjury, I certify that:
1) The number shown on this form is my correct Taxpayer Identification Number, and
2) UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an individual Retirement Arrangement (IRA), and payments other than interest and dividends).

☐ I am subject to backup withholding.    ☒ I am exempt from backup withholding.

Signature
X _David M. Tofolo_

## Signatures
**Everything I have stated in this application is correct. I understand that you will retain this application. You are authorized to check my credit and employment history and to answer questions about your credit experience with me. I have received a copy of your applicable account agreement and Use of Information brochure and agree to be bound by them. I also agree to the terms of the dispute resolution program described in the account agreement. Under this program our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge.**

| For account number(s) | | Type(s) | TIN |
|---|---|---|---|
| 8261 | | | |
| 84839 | | | |
| 7460 | | | |

Authorized signature
X _David M. Tofolo_    12-21-00
Authorized signature

Cust. #2    X _Gloria D. Tofolo_    12-21-00
cust #3    X _Al S. Severez_    12-21-00
Authorized signature
X

| 8261 | Name P. Jahangiri   C2911    4514 |
| 4839 | Phone# 949 8340128    Officer Code    Location # |
| 7460 | Wells Fargo Bank, N.A.    E2232-011 |
| | Aliso Viejo Office / Au# 00842    COID 114 |

W 14790 (3-00-19310-J) PH

1/2

# Consumer Account Application

Bank name **Aliso Viejo Office**

| Account(s) I Want to Open | | Bank Use Only |
|---|---|---|
| 82261 | | |
| 4839 | | |
| X4100 | | |

| **Customer Information** | | | | | **Customer Information** | | | |
|---|---|---|---|---|---|---|---|---|
| Full name **Kelly Sue Leverenz** | | | | | Full name | | | |
| Street address **9 Sierra Vista** | | | How long at this address Yr / Mo | | Street address | | | How long at this address Yr / Mo |
| City **Laguna Niguel** | | State **CA** | Zip code **92677** | Only | City | | State / Zip code | Only |
| Taxpayer identification number (TIN) | | Home phone **(949)463-7724** | | | Taxpayer identification number (TIN) | | Home phone | |
| Previous street address **same** | | How long at this address Yr / Mo | | | Previous street address | | | How long at this address Yr / Mo |
| City | | State / Zip code | | | City | | State / Zip code | |

| Current employer **Enterprise** | | | Business telephone number **(30)329-3030** | Current employer | | | Business telephone number |
|---|---|---|---|---|---|---|---|
| Current employer's address **17210 S. Main Street** | | | How long with employer Yr / Mo | Current employer's address | | | How long with employer Yr / Mo |
| City **Gardena** | | State **CA** / Zip code **90248** | | City | | State / Zip code | |
| Driver's license or other identification number **CADL** | | Date of birth **6/03 6/14/67** | | Driver's license or other identification number | | Date of birth | |
| **existing** | | **2/94** | | | | | |

cust.#3 (next to Customer Information)

## My Previous Account (most recent)

| Name of financial institution and city | | Checking account number |
|---|---|---|
| Verification | | |

## Request for Taxpayer Identification Number and Certification   (Substitute Form W-9)

**Certification:** Under penalties of perjury, I certify that:
1) The number shown on this form is my correct Taxpayer Identification Number, and
2) UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an individual Retirement Arrangement (IRA), and payments other than interest and dividends).

cust.#3

☐ I am subject to backup withholding.    ☒ I am exempt from backup withholding.    Signature   x _Kelly S. Leverenz_

## Signatures

Everything I have stated in this application is correct. I understand that you will retain this application. You are authorized to check my credit and employment history and to answer questions about your credit experience with me. I have received a copy of your applicable account agreement and Use of Information brochure and agree to be bound by them. I also agree to the terms of the dispute resolution program described in the account agreement. Under this program our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge.

| For account number(s) | | Type(s) | | TIN |
|---|---|---|---|---|
| Authorized signature x _Kelly S. Leverenz_ | Date 12-21-00 | | | |
| Authorized signature x | Date | | | |
| Authorized signature x | Date | | | |
| x | | | | |

Name **P. Jahanpana**   Officer Code **C2911**   Location # **4514**
Phone **(949) 831-0128**   E2232-011
Wells Fargo Bank, N.A.   COID 114
Aliso Viejo Office / Au# 00842

W 16P00 (3-00-1031P-J)  PI

2/2